[CONSTITUTIONAL LAW: PRACTICE.]

## WAYMAN and another v. SOUTHARD and another.

Congress has, by the constitution, exclusive authority to regulate the proceedings in the Courts of the United States; and the States have no authority to control those proceedings, except so far as the State process acts are adopted by Congress, or by the Courts of the United States under the authority of Congress.

The proceedings on executions, and other process, in the Courts of the United States, in suits at common law, are to be the same in each State, respectively, as were used in the Supreme Court of the State in September, 1789, subject to such alterations and additions as the said Courts of the United States may make, or as the Supreme Court of the United States shall prescribe by rule to the other Courts.

A State law regulating executions, enacted subsequent to September, 1789, is not applicable to executions issuing on judgments rendered by the Courts of the United States, unless expressly adopted by the regulations and rules of those Courts.

The 34th section of the Judiciary Act of 1789, c. 20. which provides, " that the laws of the several States, except," &c. " shall be regarded as *rules of decision* in trials at common law, in the Courts of the United States, in cases where they apply," does not apply to the process and practice of the Courts. It is a mere legislative recog-

nition of the principles of universal jurisprudence, as to the operation of the *lex loci.*

The statutes of Kentucky concerning executions, which require the plaintiff to endorse on the execution that bank notes of the Bank of Kentucky, or notes of the Bank of the Commonwealth of Kentucky will be received in payment, and, on his refusal, authorize the defendant to give a replevin bond for the debt, payable in two years, are not applicable to executions issuing on judgments rendered by the Courts of the United States.

The case of *Palmer v. Allen,* (7 *Cranch,* 550.) reviewed and reconciled with the present decision.

THIS cause was certified from the Circuit Court for the District of Kentucky, upon a certificate of a division of opinion between the Judges of that Court, on several motions; which occurred on a motion made by the plaintiffs to quash the Marshal's return on an execution issued on a judgment obtained in that Court, and also to quash the replevin bond taken on the said execution, for the following causes :

1. Because the Marshal, in taking the replevin bond, and making said return, has proceeded under the statutes of Kentucky, in relation to executions; which statutes are not applicable to executions issuing on judgments in this Court, but the Marshal is to proceed with such executions according to the rules of the common law, as modified by acts of Congress, and the rules of this Court, and of the Supreme Court of the United States.

2. That if the statutes of Kentucky, in relation to executions, are binding on this Court, viz. the statute which requires the plaintiff to endorse on the execution, that bank notes of the Bank of Kentucky, or notes of the Bank of the Common-

wealth of Kentucky, will be received in payment, or that the defendant may replevy the debt for two years, are in violation of the constitution of the United States, and of the State of Kentucky, and void.

3. That all the statutes of Kentucky which authorize a defendant to give a replevin bond in satisfaction of a judgment or execution, are unconstitutional and void.

4. Because there is no law obligatory on the said Marshal, which authorized or justified him in taking the said replevin bond, or in making the said return on the said execution.

The Court below being divided in opinion on the points stated in the motion, at the request of the plaintiffs, the same were ordered to be certified to this Court.

The cause was argued by Mr. *Cheves*, and Mr. *Sergeant*, for the plaintiffs; and by Mr. *Bibb*, and Mr. *Monroe*, for the defendants, at the last term.

On the part of the plaintiffs it was insisted, that the executions issued by the Courts of the United States for the District of Kentucky, are to be regulated and governed by the laws of the United States, and not by the laws of the State of Kentucky.

It was not necessary to analyse the particular provisions of the State laws, because the questions that would arise were of a general nature, and rendered any such statement unnecessary. These questions were,

1. Whether, by the constitution of the United

States, Congress has the power to regulate the proceedings of the Federal Courts?

2. Whether Congress has regulated those proceedings, and in what manner?

1. That Congress has the power, was too plain to admit of a doubt. If they have not, they have no power at all, and the whole of that interesting portion of the constitution is inoperative. The clause in question is the third article of the constitution, which establishes and regulates the judicial power. It is a simple text, but it is a very comprehensive one, or it is nothing. It does nothing more, in terms, than authorize Congress to establish Courts, and declare the cases over which they shall have jurisdiction. The grounds of decision are, of course, comprehended. They are to be according to the law of the case. The *means* for arriving at the decision, or for giving it effect, are not expressly provided. But as the means are indispensable to the attainment of the end, which is the administration of justice, they are necessarily included in the grant; and the power to provide them is, of course, implied in the power to establish judicial tribunals. A Court is a place where justice is judicially administered.[a] To say merely that Courts should be established, would be entirely idle. To say, therefore, that Courts shall be established, means that all the needful and usual incidents to Courts shall be established.

This proposition was so completely self-evi-

---

[a] *Co. Litt.* 58.

dent as not to admit of any support from argu-

ment or illustration, nor to require any aid from the clause in the first article, giving Congress power to make all laws necessary and proper for carrying into execution the other power expressly granted, or vested in the government of the United States, or in any department or officer thereof. That it was so understood is plain, from the fifth, sixth, and seventh articles of the original amendments, which are limitations of the generality of a power otherwise unlimited.

That it was not the design of the constitution finally and irrevocably to adopt any existing system of State legislation as to process, by reference thereto, is quite certain, because there is no such reference. It could not refer by implication to the means employed in the State Courts, because they were many, and no one could say which was referred to. It would have been unwise, because it would have made the system invariable, and capable of no amendment. It could not have meant to refer to the varying forms adopted by the State Courts, for it was impossible to anticipate how they would be distributed; these are subjects of jurisdiction, for which the State institutions could afford no example, because they had no such tribunals, the jurisdiction being exclusive; and it would have made the existence of the national judiciary dependent upon State legislation.

It must, therefore, be taken for granted, that the power of Congress in arranging the Federal judicial tribunals, and the means to be employed.

1825.

Wayman
v.
Southard.

by them for effectuating the design of their es-
tablishment, was plenary, and subject to no ex-
ceptions but those which the constitution itself
has made.    The acts of Congress, to be referred
to, would show that this had been the uniform
understanding.    Nor is the power of Congress
on this subject greater in cases where the United
States are a party, than in other cases, where the
controversy is between individuals.

2. The next question was, what had been done
by Congress?

The act of the 24th of September, 1789, c. 20.
established the judicial tribunals.    The 34th sec-
tion enacts, that " the laws of the several States,
except where the constitution, treaties, or sta-
tutes of the United States shall otherwise require
or provide, shall be regarded as rules of decision
in trials at common law in the Courts of the
United States, in cases where they apply."    But
this merely gives the ground of decision; it does
not give the means of attaining the decision, or
of giving it effect.

The powers of the Courts are conferred by
the sections from 13 to 17 inclusive.    The Courts
being thus established, their jurisdiction defined,
or to be defined, and the nature of their proceed-
ings distinguished, the power to issue the com-
mon law writs of mandamus and prohibition,
is vested in the Supreme Court by the latter part
of the 13th section. The 14th section then gives
them power to issue " writs of *scire facias, ha-
beas corpus*, and all other writs not specially pro-
vided for by statute, which may be necessary for

the exercise of their respective jurisdictions, and

agreeable to the usages and principles of law."
This is to be taken *ad referendum*, according to
the function they were to perform. They were to
be common law Courts, proceeding according to
the course of the common law, with power to issue
writs agreeably to the principles and usages of
that law. The common law remedies were,
therefore, adopted by the Judiciary Act of 1789,
c. 20. and it has been judicially determined that
these remedies are to be not according to the va-
rying practice of the State Courts, but according
to the principles of the common law, as settled in
England.[a] This, of course, is to be understood
with the exception of such modifications as have
been made by acts of Congress, the rules of
Court made under those acts, and the State laws
in force in 1789.

The 18th section, considering that there would
be an immediate right of execution by the pre-
vious provisions, gave a limited stay. There are
further provisions to the same effect in the 23d,
24th, and 25th sections. There are various other
provisions, but the result is, in all but the excepted
cases, to give an immediate right of execution,
or after a limited delay.

This act was followed immediately by the
Process Act of the 29th of September, 1789, c. 21.
The second section enacts, "that the forms of
writs, except their style, and modes of process,"
&c. " in the Circuit and District Courts, in suits

[a] See Robinson v. Campbell, 3 *Wheat. Rep.* 221.

at common law, shall be the same in each State respectively as are now used or allowed in the Supreme Courts of the same." The act was limited to the end of the next session. It was continued by an act of the 26th of May, 1790; and, by the act of the 8th of May, 1792, c. 137. [xxxvi.] its provisions were made permanent.

Whether these acts, in their terms, are to be understood as embracing the *forms* of process only, or also as describing the effect, was not, perhaps, very material to inquire. The words, understood in their natural sense, comprehend the whole. The proviso as to executions shows that they were so understood. But it is entirely certain, that by the conjoint operation of the Judiciary Act, and the Process Act, the means to be used in the administration of justice, as to their nature, form, and effect, were fixed upon a permanent basis; subject to alteration by no other legislative power than that of Congress, and by the power given to the Courts of the United States in the second section of the act of the 8th of May, 1792, c. 137. [xxxvi.] With the exception of changes since made by Congress, and by the Court, the remedies now to be used are the same as were used in September, 1789. Whoever would know what are the remedies in a given case, must inquire what they were in the particular State at that time. And these remedies are of exactly the same efficacy, and have the same power and operation, now as then. Any thing short of this would be inadequate to the end to be accomplished. The process is nothing

but for the effect.  The Court is nothing with-
out its process.  To leave this dependent upon
State legislation, would be to leave the adminis-
tration of justice in the Federal Courts at the
mercy of the States.  Congress has made many
changes, and many more are wanting.  The
Courts of the United States have made rules for
regulating the practice.  But in no case have
changes in any of these particulars been intro-
duced into the Courts of the Union, either by the
legislation of the States, or the rules of the State
Courts.

But, independent of these general considera-
tions, the question has been repeatedly subjected
to judicial determination both in the Circuit
Courts and in this Court.  Thus, in the *United
States* v. *Worson*,[a] it was held, that the provision
in the 34th section of the Judiciary Act of 1789,
c. 20. making the State laws rules of decision in
the Courts of the Union, did not apply to the pro-
cess and practice of the Federal Courts.  In
*Campbell* v. *Robinson*,[b] this Court held, that the
remedies in the Courts of the United States,
both at common law and in equity, are to be, not
according to the fluctuating practice of the State
Courts, but according to the principles of com-
mon law and equity as distinguished and defined
in that country from which we derive our know-
ledge of those principles.  The case of *Palmer*

1825.

Wayman
v.
Southard.

a 1 *Gallis. Rep.* 5. 18.  See also 1 *Peters' Rep. Circ. Co.*
484.

b 3 *Wheat. Rep.* 212. 221.

v. *Allen*[a] also confirms the principle for which the plaintiffs insisted.

The value of the process of execution depends upon the time when it may be had, and the manner in which it may be executed, and the subjects upon which it may be levied. If it should be asked, whether a State may not withdraw certain kinds of property from execution, the answer would be, that this was not the question here, and it was not necessary to go out of the case. If the power to establish a judiciary necessarily include the power to confer upon it the authority to use the needful remedies, it must certainly be allowed that the States cannot hinder and destroy the process of execution. Such a right is wholly incompatible with the power of the Union in Congress assembled. If it may withhold one process, it may withhold all. If it can modify, i. e. impair, or weaken, the efficacy of the process, the consequence is the same. The Courts would be then left with the power to adjudicate, but without the power to enforce their decisions. But here the property sought to be reached is subject to execution by the laws of the State ; and where the end is permitted, the means of attaining it must be left free.

It was also insisted, that the statutes of Kentucky in question were repugnant to the constitution of the United States, as impairing the obligation of contracts, and as being tender laws. But as the Court intimated that the cause might

a 7 *Cranch's Rep.* 550.

be upon the other points, the argument upon the constitutionality of the act was not pressed.

On the part of the defendants it was insisted,

1. That Congress has no power, under the constitution, to enact an execution law, governing the substance of the proceedings on executions from the Federal Courts, in suits between private individuals.

2. That, supposing Congress to possess such a power, it could not delegate its authority to the Supreme and other Courts of the United States.

3. That the acts of Congress applicable to this subject, do not attempt to delegate that authority to the Courts of the Union.

4. That Congress has not attempted to establish a uniform execution law throughout the United States, nor adopted the laws of the States in force at any particular period, but left the process of execution to be regulated from time to time by the local State laws.

In support of the first point, a distinction was drawn between cases arising from the character of the parties, such as citizens of different States, aliens, &c. and cases arising from the nature of the controversy, as involving the constitution, laws, and treaties of the Union, and over which the Federal Courts had either an original or appellate jurisdiction. The first class of cases arose either under foreign or municipal law, which must be applied as the rule of decision. The remedy followed as a part of the local law of the State where the suit was brought. It was not necessary for Congress to exercise any legis-

lative power over this class of cases, as it was over the other, depending upon the constitution, laws, and treaties of the Union. The grant of judicial power was here more extensive than the legislative. It was not necessary that Congress should have the power of establishing a civil code for the decision of this class of cases. Neither was it necessary that Congress should regulate the substance of the remedies, which might safely be left to the State legislatures, so long as they made no laws prohibited by the constitution respecting contracts. The power delegated in the third article of the constitution was exclusively judicial, and, therefore, Congress, whose powers are legislative only, are necessarily excluded. The power given to Congress in the first article, " to constitute tribunals inferior to the Supreme Court," does not include the power of regulating the remedies as to this class of cases. In making these regulations, Congress must either have the power to authorize the selling all property under the process of the Federal Courts, or it is restricted to such as the State legislatures think fit to subject to execution. If the former, the power includes an extensive control over the civil legislation of the States as to property and contracts, which the constitution never contemplated. If the latter, it is an illusory power, since, if the States may exempt from, or subject to, execution, in their discretion, they may also regulate the manner of levying it in all other respects. As to the power to make all laws necessary and proper to carry into effect the other powers, &c. it

applied only to those conferred for national pur-
poses, and not to mere judicial power, which
must be exercised according to the municipal
law applicable to the case. Congress had so de-
termined, in the 34th section of the Judiciary
Act, by which the State laws were made " rules
of decision in trials at common law in the Courts
of the United States, in cases where they apply."
They do apply in the decision of all controver-
sies between citizens of different States, or be-
tween aliens and citizens.

2. In support of the second point, that Congress
could not delegate its authority of regulating
process (whatever might be the extent of it) to
the Courts of the Union, it was argued, that by
the general principles of all free and limited go-
vernment, as well as the particular provisions of
the Federal constitution, the legislative, execu-
tive, and judicial powers, are vested in separate
bodies of magistracy. All the legislative power
is vested exclusively in Congress. Supposing
Congress to have power, under the clause, for
making all laws necessary and proper, &c. to
make laws for executing the judicial power of
the Union, it cannot delegate such power to the
judiciary. The rules by which the citizen shall
be deprived of his liberty or property, to enforce
a judicial sentence, ought to be prescribed and
known; and the power to prescribe such rules
belongs exclusively to the legislative department.
Congress could not delegate this power to the
judiciary, or to any other department of the go-
vernment. The right to liberty and property is a

1825.

Wayman
v.
Southard.

1815.

Wayman
v
Southard.

sacred vested right under the constitution and laws of the Union and States. The regulations by which it is to be devested, for the purpose of enforcing the performance of contracts, are of vital importance to the citizen. The power of making such regulations is exclusively vested in the legislative department, by all our constitutions, and by the general spirit and principles of all free government. It is the office of the legislator to prescribe the rule, and of the Judge to apply it; and it is immaterial whether it respects the right in controversy, or the remedy by which it is to be enforced. The mere forms and style of writs, and other process, may, indeed, be regulated by the Courts, but the regulation of the substantive part of the remedy belongs to the legislature. The power to establish Courts, with the jurisdiction defined by the constitution, does not involve, by necessary implication, the authority of delegating any portion or incident of that power to the Courts themselves. That authority is not expressly given; consequently it does not exist.

3. Congress has not, in fact, delegated this authority to the Court. The several Process Acts passed by Congress, regulate the *forms* only; they give to the Courts the power to regulate the forms only. The expressions in the 2d section of the act of 1792, c. 137. [xxxvi.] "subject, however, to such alterations as the said Courts respectively shall, in their discretion, deem expedient, or to such regulations as the Supreme Court of the United States shall think proper,

from time to time, by rule, to prescribe to any Circuit or District Court," apply only to "the forms of writs, executions, and other process, and the forms and modes of proceeding in suits."

Every Court has, like every other public political body, the power necessary and proper to provide for the orderly conduct of its business. This may be compared to the separate power which each house of Congress has to determine the rules of its proceedings, and to punish contempts. This is altogether different from the general legislative power, which Congress cannot delegate, and never has attempted to delegate, to either house, separately, or to the executive and judicial departments of the government. To construe the power to regulate the forms of process and modes of proceeding, into a power in the Courts to make execution laws, would be to suppose Congress intended to violate the constitution, by delegating their legislative power to the judiciary. The laws of the States on the subject of executions are various and contradictory. Did Congress mean to give to this Court the power to make a uniform execution law throughout the Union, or to adopt the common law of England, and thus to repeal the statutes of all the States regulating what shall, and what shall not, be subject to execution? The forms of process are distinct from the rights and duties to be observed in their execution. The usual form of a *fi. fa.* is a mandate to the Marshal to make the money of the goods and chattels of the defend-

1825.

Wayman
v.
Southard.

ant; but what property may or may not be levied, and how, and when, and where it is to be sold, and whether the same is subject to redemption by the debtor, are all of the substance of the remedy.

4. In support of the position that Congress intended to leave the process of execution to be regulated from time to time by the State laws, it was argued, that the Process Act of 1792, c. 137. [xxxvi.] omits the words contained in the 2d section of the Process Act of 1789, c. 21., " *and modes of process*," used after the words " forms of writs and executions," &c. The expressions which seem to occupy, in the act of 1792, the place of these omitted words are the following: " and modes of proceeding in suits," which are too unequivocal to require comment. " Modes of proceeding in suits," made use of in connexion with the preceding words, " writs, executions," &c., plainly refer to those acts in Court which relate to the determination of the controversy, in opposition and contradistinction to the forms of the mesne process, and also of the process of execution by which the judgment is enforced after the termination of the suit. Proceedings after judgment are always distinguished by law writers, both from the mesne process, and from the proceedings in the suit.[a] There is a plain difference between the forms of writs, and their effects, with the powers and duties conferred under them; between the modes

a 3 *Bl. Comm.* c, 24. 25. 26.

of proceeding in suits, and the laws of execution to enforce the judgment. The only clause in the Process Act of 1789, c. 21. which favoured the notion that it was the intention of Congress to prescribe the effect of any writ of execution, had been omitted in the Process Act of 1792, c. 137. [xxxvi.] The concluding paragraph in the 2d section of the act of 1789, c. 21. " and be at liberty to pursue the same, until a tender of the debt and costs in gold and silver shall be made," was entirely omitted in the subsequent act. And the circumstance of this act having been confined in its duration to one year, and that at the two succeeding sessions it had been continued for the same term only, and when the permanent act was passed, this clause, as well as the indefinite expression, " modes of process," were both excluded, showed that they were purposely excluded, so that no effect should be given to writs of execution, other than what they would receive from the local laws of the States.

The provision in the 34th section of the Judiciary Act of 1789, c. 20., making the State laws rules of decision in cases where they apply, furnishes the rules by which this case is to be determined. The question is, whether the Marshal has conducted himself according to law in executing this process. The mere *form* of the writ is insufficient to determine it. If you apply the State execution laws as existing in 1789, or 1792, nearly all the western States will be left without an execution law applicable in the Federal Courts, since they were admitted into the

Union subsequent to the enactment of the Process Acts.

Congress has itself given a legislative exposition of the acts now in question, evidently considering the execution laws of the States to be the laws of execution for the Federal Courts. By the Judiciary Act of 1793, c. 167. [xxii.] s. 8., it is provided, " That where it is now required by the laws of any State, that goods taken in execution on a writ of *fieri facias*, shall be appraised previous to the sale thereof," the like proceedings are to be had on executions issuing out of the Courts of the United States. So, also, by the act of May 7, 1800, c. 199. [xxv.] regulating sales of lands, on judgments obtained by the United States, it is enacted, (sec. 1.) " That where the United States shall have obtained judgment in civil actions brought in those States wherein, by the laws and practice of such States, lands, or other real estate, belonging to the debtor, are delivered to the creditor in satisfaction of such judgment," &c. the Marshal is to proceed to sell at public auction; and to execute a grant to the highest bidder. These legislative expositions were made long before the present case arose, and are as binding in fixing the sense of the legislature as any declaratory act which Congress could make on the subject.

The Process Acts regulate the forms of writs, and the modes of proceeding in suits; and give the Courts the power to alter both. The 14th section of the Judiciary Act of 1789, c. 20. gives

to the Courts power to issue writs " necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law." Where a Court has issued the execution, according to the form provided under the Process Acts, it has done all that is authorized by the 14th section of the Judiciary Act, and by the Process Acts. The rule which is to govern the manner of levying the execution, is to be found in the 34th section of the Judiciary Act. Various regulations prevail in the States, as to what property is liable to execution. In some, lands are exempt, except upon an elegit; in others, certain personal property is exempt; in all, the *ca. sa.* is variously-modified. How are all these conflicting regulations to be reconciled, but by resorting to the wise and safe provision contained in the 34th section of the Judiciary Act, which gives the same rule as to the substance of the remedy which applies to the right in controversy, and the same for the Federal Courts as is used at the time in the State Courts?

To the argument which had been urged for the plaintiffs, that, upon the supposition that executions from the Federal Courts are to be regulated by the local laws in each State, the State legislatures might entirely defeat the administration of justice in those Courts, by exempting all property from execution, it was answered, that Congress (supposing them to possess the constitutional power) might, at any time, apply an effectual remedy by enacting a uniform law on the subject; and that, in the mean time, all regula-

1825.

Wayman
v.
Southard

1825.

Wayman
v.
Southard.

tions made by the States. must apply equally to their own Courts; and it was an inadmissible and extravagant supposition, that any State would thus entirely suspend the course of civil justice. It was the province of every sovereign legislature to regulate it, so far as the society had not surrendered that right to another power. In the present instance, even supposing the constitution to be silent on the subject, Congress had shown a disposition to leave to the States the power of regulating it, except as to cases arising under the constitution, laws, and treaties of the Union, and of peculiar federal cognizance, and excepting that general power of regulating the forms of process, and proceedings, which is essential to every Court of justice.

The cause was continued to the present term for advisement.

Feb. 12th, 1825.

Mr. Chief Justice MARSHALL delivered the opinion of the Court, and, after stating the case, proceeded as follows:

Some preliminary objections have been made by the counsel for the defendants, to the manner in which these questions are brought before the Court, which are to be disposed of before the questions themselves can be considered.

It is said that the proceeding was *ex parte*. The law which empowers this Court to take cognizance of questions adjourned from a Circuit, gives jurisdiction over the single point on which the Judges were divided, not over the whole cause. The inquiry, therefore, whether the par-

ties were properly before the Circuit Court, cannot be made, at this time, in this place.

The defendants also insist, that the judgment, the execution, and the return, ought to be stated, in order to enable this Court to decide the question which is adjourned.

But the questions do not arise on the judgment, or the execution; and, so far as they depend on the return, enough of that is stated, to show the Court, that the Marshal had proceeded according to the late laws of Kentucky. In a general question respecting the obligation of these laws on the officer, it is immaterial whether he has been exact, or otherwise, in his observance of them. It is the principle on which the Judges were divided, and that alone is referred to this Court.

In arguing the first question, the plaintiffs contend, that the common law, as modified by acts of Congress, and the rules of this Court, and of the Circuit Court by which the judgment was rendered, must govern the officer in all his proceedings upon executions of every description.

One of the counsel for the defendants insists, that Congress has no power over executions issued on judgments obtained by individuals; and that the authority of the States, on this subject, remains unaffected by the constitution. That the government of the Union cannot, by law, regulate the conduct of its officers in the service of executions on judgments rendered in the Federal Courts; but that the State legislatures retain complete authority over them.

The Court cannot accede to this novel con-

1825.

Wayman
v.
Southrad.

Congress has power to regulate the process in all cases, in the Courts of the Union.

1825.

Wayman
v.
Southard.

struction. The constitution concludes its enumeration of granted powers, with a clause authorizing Congress to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof. The judicial department is invested with jurisdiction in certain specified cases, in all which it has power to render judgment.

That a power to make laws for carrying into execution all the judgments which the judicial department has power to pronounce, is expressly conferred by this clause, seems to be one of those plain propositions which reasoning cannot render plainer. The terms of the clause, neither require nor admit of elucidation. The Court, therefore, will only say, that no doubt whatever is entertained on the power of Congress over the subject. The only inquiry is, how far has this power been exercised?

The 14th section of the Judiciary Act of 1789, c. 20. authorizes the Courts of the U. S. to issue writs of execution, as well as other writs.

The 13th section of the Judiciary Act of 1789, c. 20. describes the jurisdiction of the Supreme Court, and grants the power to issue writs of prohibition and mandamus, in certain specified cases. The 14th section enacts, " that all the before-mentioned Courts of the United States shall have power to issue writs of *scire facias, habeas corpus*, and all other writs not specially provided by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law." The 17th section authorizes the Courts " to make all necessary rules for the orderly conducting busi-

ness in the said Courts;" and the 18th, empow-
ers a Court to suspend execution, in order to give
time for granting a new trial.

These sections have been relied on by the coun-
sel for the plaintiffs.

The words of the 14th are understood by the
Court to comprehend executions. An execution
is a writ, which is certainly " agreeable to the
principles and usages of law."

There is no reason for supposing that the gene-
ral term " writs," is restrained by the words,
" which may be necessary for the exercise of
their respective jurisdictions," to original pro-
cess, or to process anterior to judgments. The
jurisdiction of a Court is not exhausted by the
rendition of its judgment, but continues until
that judgment shall be satisfied. Many questions
arise on the process subsequent to the judgment,
in which jurisdiction is to be exercised. It is,
therefore, no unreasonable extension of the words
of the act, to suppose an execution necessary for
the exercise of jurisdiction. Were it even true,
that jurisdiction could technically be said to ter-
minate with the judgment, an execution would
be a writ necessary for the perfection of that
which was previously done; and would, conse-
quently, be necessary to the beneficial exercise
of jurisdiction. If any doubt could exist on this
subject, the 18th section, which treats of the au-
thority of the Court over its executions as actu-
ally existing, certainly implies, that the power to
issue them had been granted in the 14th section.
The same implication is afforded by the 24th

1825.   and 25th sections, both of which proceed on the idea that the power to issue writs of execution was in possession of the Courts. So, too, the Process Act, which was depending at the same time with the Judiciary Act, prescribes the forms of executions, but does not give a power to issue them.

On the clearest principles of just construction, then, the 14th section of the Judiciary Act must be understood, as giving to the Courts of the Union, respectively, a power to issue executions on their judgments.

But this section provides singly for issuing the writ, and prescribes no rule for the conduct of the officer while obeying its mandate. It has been contended, that the 34th section of the act supplies this deficiency.

The 34th section of the Judiciary Act of 1789, c. 20. does not apply to the process and practice of the Courts.

That section enacts, " that the laws of the several States, except where the constitution, treaties, or statutes, of the United States, shall otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the Courts of the United States, in cases where they apply."

This section has never, so far as is recollected, received a construction in this Court ; but it has, we believe, been generally considered by gentlemen of the profession, as furnishing a rule to guide the Court in the formation of its judgment ; not one for carrying that judgment into execution. It is " a rule of decision," and the proceedings after judgment are merely ministerial. It is, too, " a rule of decision in trials at

Wayman v. Southard.

common law ;" a phrase which presents clearly
to the mind the idea of litigation in Court, and
could never occur to a person intending to de-
scribe an execution, or proceedings after judg-
ment, or the effect of those proceedings. It is
true, that if, after the service of an execution, a
question respecting the legality of the proceed-
ing should be brought before the Court by a re-
gular suit, there would be a trial at common law;
and it may be said, that the case provided for by
the section would then occur, and that the law
of the State would furnish the rule for its de-
cision.

But, by the words of the section, the laws of
the State furnish a rule of decision for those
cases only " where they *apply ;*" and the ques-
tion arises, do they *apply* to such a case ? In
the solution of this question, it will be necessary
to inquire whether they regulate the conduct of
the officer serving the execution ;- for it would be
contrary to all principle to admit, that, in the
trial of a suit depending on the legality of an
official act, any other law would *apply* than that
which had been previously prescribed for the
government of the officer. If the execution is
governed by a different rule, then these laws do
not *apply* to a case depending altogether on the
regularity of the proceedings under the execu-
tion. If, for example, an officer take the pro-
perty of A., to satisfy an execution against B.,
and a suit be brought by A., the question of pro-
perty must depend entirely on the law of the
State. But if an execution issue against A., as

he·supposes, irregularly, or if the officer should be supposed to act irregularly in the performance of his duty, and A. should, in either case, proceed against the officer, the State laws will give no rule of decision in the trial, because they do not *apply* to the case, unless they be adopted by this section as governing executions on judgments rendered by the Courts of the United States. Before we can assume, that the State law *applies* to such a case, we must show that it governs the officer in serving the execution; and, consequently, its supposed application to such a case is no admissible argument in support of the proposition that it does govern the execution. That proposition, so far as it depends on the construction of the 34th section, has already been considered; and we think that, in framing it, the legislature could not have extended its views beyond the judgment of the Court.

The 34th section, then, has no application to the practice of the Court, or to the conduct of its officer, in the service of an execution.

The 17th section would seem, both from the context and from the particular words which have been cited as applicable to this question, to be confined to business actually transacted in Court, and not to contemplate proceedings out of Court.

The act to " regulate processes in the Courts of the United States," passed in 1789, has also been referred to. It enacts, " that until farther provision shall be made, and except where by this act, or other statutes of the United States,

is otherwise provided, the forms of writs and executions, except their style, and modes of process, in the Circuit and District Courts, in suits at common law, shall be the same in each State respectively, as are now used in the Supreme Courts of the same.

This act, so far as spects the writ, is plainly confined to form. Bι form, in this particular, it has been argued, has much of substance in it, because it consists of the language of the writ, which specifies precisely what the officer is to do. His duty is prescribed in the writ, and he has only to obey its mandate.

This is certainly true, so far as respects the object to be accomplished, but not as respects the manner of accomplishing it. In a *fi. fa.*, for example, the officer is commanded to make of the goods and chattels of A. B. the sum of money specified in the writ; and this sum must, of course, be made by a sale. But the time and manner of the sale, and the particular goods and chattels which are liable to the execution, unless, indeed, all are liable, are not prescribed.

To " the forms of writs and executions," the law adds the words, " and modes of process," These words must have been intended to comprehend something more than "the forms of writs and executions." We have not a right to consider them as mere tautology. They have a meaning, and ought to be allowed an operation more extensive than the preceding words. The term is applicable to writs and executions, but it is also applicable to every step taken in a cause.

It indicates the progressive course of the business from its commencement to its termination; and " modes of process" may be considered as equivalent to modes or manner of proceeding. If, by the word process, Congress had intended nothing more than a general phrase, which might comprehend every other paper issuing out of a Court, the language would most probably have resembled that of the first section, where the word " processes," not " process," is used in that sense. But the introduction of the word " modes," and the change of the word " processes" for " process," seem to indicate that the word was used in its more extensive sense, as denoting progressive action; a sense belonging to the noun in the singular number, rather than in the sense in which it was used in the first section, which is appropriate to the same noun in its plural number.

This construction is supported by the succeeding sentence, which is in these words : " and the forms and modes of proceedings, in causes of equity, and of admiralty, and maritime jurisdiction, shall be according to the course of the civil law."

The preceding sentence had adopted the forms of writs and executions, and the modes of process, then existing in the Courts of the several States, as a rule for the Federal Courts, " in suits at common law." And this sentence adopts " the forms and modes of proceedings" of the civil law, " in causes of equity, and of admiralty and maritime jurisdiction." It has not, we be-

lieve, been doubted, that this sentence was intend-
ed to regulate the whole course of proceeding,
" in causes of equity, and of admiralty and ma-
ritime jurisdiction."   It would be difficult to as-
sign a reason for the solicitude of Congress to
regulate all the proceedings of the Court, sitting
as a Court of equity, or of admiralty, which
would not equally require that its proceedings
should be regulated when sitting as a Court of
common law.   The two subjects were equally
within the province of the legislature, equally
demanded their attention, and were brought. to-
gether to their view.   If, then, the words making
provision for each, fairly admit of an equally ex-
tensive interpretation, and of one which will effect
the object that seems to have been in contempla-
tion, and which was certainly desirable, they
ought to receive that interpretation.   " The
forms of writs and executions, and modes of pro-
cess in suits at common law," and " the forms
and modes of proceedings, in causes of equity,
and of admiralty and maritime jurisdiction," em-
brace the same subject, and both relate to the
progress of a suit from its commencement to its
close.

It has been suggested, that the words " in
suits at common law," restrain the preceding
words to proceedings between the original writ
and judgment.   But these words belong to "writs
and executions," as well as to " modes of pro-
cess," and no more limit the one than the other.
As executions can issue only after a judgment

1825.

Wayman
v.
Southard.

the words, " in suits at common law," must apply to proceedings which take place after judgment.

But the legal sense of the word suit adheres to the case after the rendition of the judgment, and it has been so decided.[a]

This construction is fortified by the proviso, which is in these words: " Provided, that on judgments, in any of the cases aforesaid, where different kinds of executions are issueable in succession, a *capias ad satisfaciendum* being one, the plaintiff shall have his election to take out a *capias ad satisfaciendum* in the first instance, and be at liberty to pursue the same, until a tender of the debt and costs in gold or silver shall be made."

The proviso is generally intended to restrain the enacting clause, and to except something which would otherwise have been within it, or, in some measure, to modify the enacting clause. The object of this proviso is to enable the creditor to take out a *capias ad satisfaciendum* in the first instance, and to pursue it until the debt be satisfied, notwithstanding any thing to the contrary in the enacting clause. It is perfectly clear, that this provision is no exception from that part of the enacting clause which relates to the "forms of writs and executions," and can be an exception to that part only which relates to the "modes of process." It secures the right to elect the *capias ad satisfaciendum*, in the first instance, where that writ was at all issueable under the law of the State ; and to pursue it until the debt and

a *Co. Litt.* 291. 8 *Co.* 53. *b.*

costs be tendered in gold or silver. It relates to the time and circumstances under which the execution may issue, and to the conduct of the officer while in possession of the execution. These, then, are objects which Congress supposed to be reached by the words "modes of process," in the enacting clause.

This law, though temporary, has been considered with some attention, because the permanent law has reference to it, and adopts some of its provisions. It was continued until 1792, when a perpetual act was passed on the subject. This, whether merely explanatory, or also amendatory of the original act, is the law which must decide the question now before the Court.

It enacts, "that the forms of writs, executions, and other process, except their style, and the forms and modes of proceeding in suits in those of common law, shall be the same as are now used in the said Courts respectively, in pursuance of the act entitled, "an act to regulate processes in the Courts of the United States," except so far as may have been provided for by the act to establish the judicial Courts of the United States ; subject, however, to such alterations and additions as the said Courts respectively shall, in their discretion, deem expedient, or to such regulations as the Supreme Court of the United States shall think proper, from time to time, by rule, to prescribe to any Circuit or District Court concerning the same.

This act is drawn with more deliberation than the original act; and removes, so far as respects

1825.

Wayman
v.
Southard.

The Process-Act of 1792, c. 137. [xxxvi.] is the law which regulates executions issuing from the Courts of the U. S.; and it adopts the practice of the Supreme Court of the States in 1789, as the rule for governing proceedings on such executions, subject to such alterations as the Courts of the U. S. may make, but not subject to the alterations which have since taken place in the State laws and practice.

the question now under consideration, some doubt which might be entertained in relation to the correctness with which the act of 1789 has been construed. It distinguishes very clearly between the forms of writs, and all other process of the same character, and the forms and modes of proceeding in suits, and provides for both. It is impossible to confound "the forms of writs, executions, and other process," which are to be attested by a Judge, and to be under the seal of the Court from which they issue, with "the forms and modes of proceeding in suits." They are distinct subjects. The first describes the paper which issues from the Court, and is an authority to the officer to do that which it commands ; the last embraces the whole progress of the suit, and every transaction in it, from its commencement to its termination, which has been already shown not to take place until the judgment shall be satisfied. It may, then, and ought to be understood, as prescribing the conduct of the officer in the execution of process, that being a part of "the proceedings" in the suit. This is to conform to the law of the State, as it existed in September, 1789. The act adopts the State law as it then stood, not as it might afterwards be made.

A comparison of the proviso to the permanent act, with that which had been introduced into the temporary act, will serve to illustrate the idea, that the proceedings under the execution were contemplated in the enacting clause, and supposed to be prescribed by the words "modes of pro-

1825.

Wayman
v.
Southard

cess," in the one law; and "modes of proceeding," in the other.

The proviso to the act of 1789, authorizes the creditor to sue out a *capias ad satisfaciendum* in the first instance, and to continue it " until a tender of the debt in gold and silver shall be made." The proviso to the act of 1798, omits this last member of the sentence.

The appraisement laws existing in some of the States, authorized a debtor taken in execution to tender property in discharge of his person; and this part of the proviso shows an opinion, that the enacting clause adopted this privilege, and an intention to deprive him of it. The enacting clause of the act of 1793, adopts the State law, to precisely the same extent with the enacting clause of the act of 1789; and the omission of the clause in the proviso which has been mentioned, leaves that part of the adopted law, which allows the creditor to discharge his person by the tender of property, in force.

The subject was resumed in 1793, in the act, entitled, " An act in addition to the act entitled an act to establish the judicial Courts of the United States."

The 8th section enacts, " that, where it is now required by the laws of any State, that goods taken in execution on a writ of *fieri facias* shall be appraised previous to the sale thereof, it shall be lawful for the appraisers appointed under the authority of the State, to appraise goods taken in execution on a *fieri facias* issued out of any Court of the United States, in the same manner

as if such writ had issued out of a Court held under the authority of the State; and it shall be the duty of the Marshal, in whose custody such goods may be, to summon the appraisers in like manner as the Sheriff is, by the laws of the State, required to summon them;" " and if the appraisers, being duly summoned, shall fail to attend and perform the duties required of them, the Marshal may proceed to sell such goods without an appraisement."

This act refers to the appraisement laws of the respective States, which were in force at the time of its passage, without distinguishing between those which were enacted before, and those which were enacted after, September, 1789. The fact, however, is understood to be, that they were enacted previous to that time, generally as temporary laws, and had been continued by subsequent acts. They required, so far as they have been inspected, that appraisers should be appointed by the local tribunals to appraise the property taken in execution. Supposing laws of this description to have been adopted by the act of 1789, the regular mode of proceeding under them would have been, for the Courts of the United States, respectively, to appoint appraisers, who should perform the same duty with respect to executions issuing out of the Courts of the Union, as was performed by appraisers appointed under State authority, with respect to executions issuing out of the Courts of the State. It was unquestionably much more convenient to employ that machinery which was already in operation, for such a

purpose, than to construct a distinct system; it was more convenient to employ the appraisers already existing in the several counties of a State, than to appoint a number of new appraisers, who could not be known to the Courts making such appointments. Accordingly, the section under consideration does not profess to adopt the appraisement laws of the several States, but proceeds on the idea, that they were already adopted, and authorizes the officer to avail himself of the agency of those persons who had been selected by the local tribunals, to appraise property taken in execution. Had these laws been supposed to derive their authority to control the proceedings of the Courts of the United States, not from being adopted by Congress, but from the vigour imparted to them by the State legislatures, the intervention of Congress would have been entirely unnecessary. The power which was competent to direct the appraisement, was competent to appoint the appraisers.

The act, passed in 1800, " for the relief of persons imprisoned for debt," takes up a subject on which every State in the Union had acted previous to September, 1789. It authorizes the Marshal to allow the benefit of the prison rules to those who are in custody under process issued from the Courts of the United States, in the same manner as it is allowed to those who are imprisoned under process issued from the Courts of the respective States.

Congress took up this subject in 1792, and provided for it by a temporary law, which was

continued from time to time, until the permanent law of 1800    It is the only act to which the attention of the Court has been drawn, that can countenance the opinion, that the legislature did not consider the Process Act as regulating the conduct of an officer in the service of executions.    It may be supposed, that, in adopting the State laws as furnishing the rule for proceedings in suits at common law, that rule was as applicable to writs of *capias ad satisfaciendum*, as of *fieri facias ;* and that the Marshal would be as much bound to allow a prisoner the benefit of the rules under the act of Congress, as to sell upon the notice, and on the credit prescribed by the State laws.

The suggestion is certainly entitled to consideration.    But were it true, that the Process Acts would, on correct construction, adopt the State laws which give to a debtor the benefit of the rules, this single act of superfluous legislation, which might be a precaution suggested by the delicacy of the subject, by an anxiety to insure such mitigation of the hardships of imprisonment, as the citizens of the respective States were accustomed to see, and to protect the officer from the hazard of liberating the person of an imprisoned debtor, could not countervail the arguments to be drawn from every other law passed in relation to proceedings on executions, and from the omission to pass laws, which would certainly be requisite to direct the conduct of the officer, if a rule was not furnished by the Process Act

But there is a distinction between the cases, sufficient to justify this particular provision. The jails in which prisoners were to be confined did not belong to the government of the Union, and the privilege of using them was ceded by the several States, under a compact with the United States. The jailers were State officers, and received prisoners committed under process of the Courts of the United States, in obedience to the laws of their respective States. Some doubt might reasonably be entertained, how far the Process Act might be understood to apply to them.

The resolution of Congress under which the use of the State jails was obtained, " recommended it to the legislatures of the several States, to pass laws, making it expressly the duty of the keepers of their jails, to receive, and safe keep therein, all prisoners committed under the authority of the United States, until they shall be discharged by due course of the laws thereof." The laws of the States, so far as they have been examined, conform to this resolution. Doubts might well be entertained, of permitting the prisoner, under this resolution, and these laws, to have the benefit of the rules. The removal of such doubts seems to have been a prudent precaution.

The case of *Palmer* v. *Allen,* (7 *Cranch's Rep.* 550.) may be considered, at first sight, as supporting the opinion, that the acts for regulating processes in the Courts of the United States, do not adopt the laws of the several States, as they stood in September. 1789, as the rule by

*1825.*

*Wayman v. Southard.*

*Palmer v. Allen, (7 Cranch, 550.) reviewed, and reconciled with the present decision.*

which the officers of the Federal Courts are to be governed in the service of process issuing out of those Courts; but, upon an examination of that case, this impression will be removed.

In that case, as appears from the statement of the Judge who delivered the opinion of this Court, Palmer, as deputy Marshal, arrested Allen on a writ sued out of the District Court of Connecticut, by the United States, to recover a penalty under a statute of the United States. Bail was demanded, and, not being given, Allen was committed to prison. For this commitment Allen brought an action of trespass, assault and battery, and false imprisonment, in the State Court. Palmer pleaded the whole matter in justification, and, upon demurrer, the plea was held insufficient. The judgment of the State Court was brought before this Court by writ of error, and was reversed; this Court being of opinion, that the plea was a good bar to the action.

The demurrer was sustained in the State Court, because, by an act of the legislature of Connecticut, the officer serving process similar to that which was served by Palmer, must, before committing the person on whom it is served, to jail, obtain a *mittimus* from a magistrate of the State, authorizing such commitment; and that Court was of opinion, that the act of Congress had adopted this rule so as to make it obligatory on the officer of the Federal Court.

This Court was of opinion, that the plea made out a sufficient justification, and, therefore, reversed the judgment of the State Court. This

judgment of reversal is to be sustained, for several reasons, without impugning the general principle, that the acts under consideration adopt the State laws as they stood in September, 1789, as giving the mode of proceeding in executing process issuing out of the Courts of the United States.

The act of 1792, for regulating processes in the Courts of the United States, enacts, that " the modes of proceeding in suits, in those of common law, shall be the same as are *now used* in the said Courts respectively, in pursuance of the act, entitled, an act to regulate processes in the Courts of the United States."

The endorsement of a *mittimus* on the writ had never been used, as appears by the opinion in the case of *Palmer* v. *Allen*, in the Courts of the United States for the District of Connecticut. In connexion with this fact, the provision of the act of 1792 subjects the modes of proceeding under the laws of the State, " to such alterations and additions as the said Courts, respectively, shall, in their discretion, deem expedient." The uniform course of that Court, from its first establishment, dispensing with this *mittimus*, may be considered as the alteration in this particular which the Court was authorized by law to make.

It may very well be doubted, too, whether the act of Congress which conforms the modes of proceeding in the Courts of the Union to those in the several States, requires the agency of State officers, in any case whatever not expressly mentioned. The laws of the Union may permit

1825.

Wayman
v.
Southard.

such agency, but it is by no means clear that they can compel it. In the case of the appraisement laws already noticed, it was deemed necessary to pass a particular act, authorizing the Marshal to avail himself of the appraisers for the State; and the same law dispenses with the appraisement, should they fail to attend. If the *mittimus* should be required by the act of Congress, it should be awarded by a Judge of the United States, not by a State magistrate, in like manner as an order for bail, in doubtful cases, is endorsed by a Judge of the United States, in cases where the State law requires such endorsement to be made by the Judge or Justice of the Court from which the process issues. The *mittimus* is a commitment for want of bail; and the magistrate who awards it, decides, in doing so, that it is a case in which bail is demandable. But in the particular case of *Allen*, that question was decided by the law. The act of Congress (act of 1799, c. 128. s. 65.) required, that bail should be given. No application to the Judge was necessary. The officer was compelled to arrest the body of Allen, and to detain him in custody until bail should be given. This act, therefore, dispenses with any order of a Judge requiring bail, and with a *mittimus* authorizing a commitment for the want of bail. The officer was obliged to detain the body of Allen in custody, and this duty was best performed by committing him to jail. These reasons operated with the Court as additional to the opinion, that the law of Connecticut, requiring a *mittimus* in

civil cases, was, in its terms, a peculiar munici-
pal regulation imposing a restraint on State
officers, which was not adopted by the Process
Act of the United States, and was a provision in-
applicable to the Courts of the Union, a provision
which could not be carried into effect according
to its letter.

The reasons assigned by the Court for its de-
cision in the case of *Palmer* v. *Allen*, so far
from implying an opinion that the Process Act
does not adopt the laws of the several States as
giving a rule to be observed by the officer in ex-
ecuting process issuing from the Courts of the
United States, recognises the general principle,
and shows why that case should be taken out of
its operation.

So far as the Process Act adopts the State laws,
as regulating the modes of proceeding in suits
at common law, the adoption is expressly con-
fined to those in force in September, 1789. The
act of Congress does not recognise the authority
of any laws of this description which might be
afterwards passed by the States. The system,
as it then stood, is adopted, " subject, however,
to such alterations and additions as the said
Courts respectively shall, in their discretion,
deem expedient, or to such regulations as the
Supreme Court of the United States shall think
proper, from time to time, by rule, to prescribe
to any Circuit or District Court concerning he
same."

This provision enables the several Courts of
the Union to make such improvements in its

1325.

Wayman
v.
Southard.

forms and modes of proceeding, as experience may suggest, and especially to adopt such State laws on this subject as might vary to advantage the forms and modes of proceeding which prevailed in September, 1789.

The provision in the Process Act of 1792, c. 137. [xxxvi.] authorizing the Courts of the U. S. to make alterations in the regulations concerning executions, and other process issuing from those Courts, is not a delegation of legislative authority, and is conformable to the constitution.

The counsel for the defendants contend, that this clause, if extended beyond the mere regulation of practice in the Court, would be a delegation of legislative authority which Congress can never be supposed to intend, and has not the power to make.

But Congress has expressly enabled the Courts to regulate their practice, by other laws. The 17th section of the Judiciary Act of 1789, c. 20. enacts, " That all the said Courts shall have power" " to make and establish all necessary rules for the orderly conducting business in the said Courts, provided such rules are not repugnant to the laws of the United States;" and the 7th section of the act, " in addition to the act, entitled, an act to establish the judicial Courts of the United States," (act of 1793, ch. 22. s. 7.) details more at large the powers conferred by the 17th section of the Judiciary Act. These sections give the Court full power over all matters of practice ; and it is not reasonable to suppose that the Process Act was intended solely for the same object. The language is different; and the two sections last mentioned have no reference to State laws.

It will not be contended that Congress can delegate to the Courts, or to any other tribunals, powers which are strictly and exclusively legisla-

tive. But Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself. Without going farther for examples, we will take that, the legality of which the counsel for the defendants admit. The 17th section of the Judiciary Act, and the 7th section of the additional act, empower the Courts respectively to regulate their practice. It certainly will not be contended, that this might not be done by Congress. The Courts, for example, may make rules, directing the returning of writs and processes, the filing of declarations and other pleadings, and other things of the same description. It will not be contended, that these things might not be done by the legislature, without the intervention of the Courts; yet it is not alleged that the power may not be conferred on the judicial department.

The line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details. To determine the character of the power given to the Courts by the Process Act, we must inquire into its extent. It is expressly extended to those forms and modes of proceeding in suits at common law, which were used in the State Courts in September, 1789, and were adopted by that act. What, then, was adopted?

We have supposed, that the manner of proceeding under an execution was comprehended by the words "forms and modes of proceeding in suits" at common law. The writ commands the officer to make the money for which judgment has been rendered. This must be understood as directing a sale, and, perhaps, as directing a sale for ready money. But the writ is entirely silent with respect to the notice; with respect to the disposition which the officer is to make of the property between the seizure and sale; and, probably, with respect to several other circumstances which occur in obeying its mandate. These are provided for in the Process Act. The modes of proceeding used in the Courts of the respective States, are adopted for the Courts of the Union, and they not only supply what is not fully expressed in the writ, but have, in some respects, modified the writ itself, by prescribing a more indirect and circuitous mode of obeying its mandate than the officer could be justified in adopting. In some instances, the officer is permitted to leave the property with the debtor, on terms prescribed by the law, and in others, to sell on a prescribed credit, instead of ready money.

Now, suppose the power to alter these modes of proceeding, which the act conveys in general terms, was specifically given. The execution orders the officer to make the sum mentioned in the writ out of the goods and chattels of the debtor. This is completely a legislative provision, which leaves the officer to exercise his discretion respecting the notice. That the legisla-

ture may transfer this discretion to the Courts, and enable them to make rules for its regulation, will not, we presume, be questioned. So, with respect to the provision for leaving the property taken by the officer in the hands of the debtor, till the day of sale. He may do this, independent of any legislative act, at his own peril. The law considers the property as his, for the purposes of the execution. He may sell it, should it be produced, in like manner as if h · had retained it in his personal custody, or may recover it, should it be withheld from him. The law makes it his duty to do that which he might do in the exercise of his discretion, and relieves him from the responsibility attendant on the exercise of discretion, in a case where his course is not exactly prescribed, and he deviates from that which is most direct. The power given to the Court to vary the mode of proceeding in this particular, is a power to vary minor regulations, which are within the great outlines marked out by the legislature in directing the execution. To vary the terms on which a sale is to be made, and declare whether it shall be on credit, or for ready money, is certainly a more important exercise of the power of regulating the conduct of the officer, but is one of the same principle. It is, in all its parts, the regulation of the conduct of the officer of the Court in giving effect to its judgments. A general superintendence over this subject seems to be properly within the judicial province, and has been always so considered. It is, undoubtedly, proper for the legislature to prescribe the man-

1825.

Wayman
v.
Southard.

ner in which these ministerial offices shall be performed, and this duty will never be devolved on any other department without urgent reasons. But, in the mode of obeying the mandate of a writ issuing from a Court, so much of that which may be done by the judiciary, under the authority of the legislature, seems to be blended with that for which the legislature must expressly and directly provide, that there is some difficulty in discerning the exact limits within which the legislature may avail itself of the agency of its Courts.

The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law ; but the maker of the law may commit something to the discretion of the other departments, and the precise boundary of this power is a subject of delicate and difficult inquiry, into which a Court will not enter unnecessarily.

Congress, at the introduction of the present government, was placed in a peculiar situation. A judicial system was to be prepared, not for a consolidated people, but for distinct societies, already possessing distinct systems, and accustomed to laws, which, though originating in the same great principles, had been variously modified. The perplexity arising from this state of things was much augmented by the circumstance that, in many of the States, the pressure of the moment had produced deviations from that course of administering justice between debtor and creditor, which consisted, not only with the spirit of the constitution, and, consequently, with

1825.

Wayman
v.
Southard.

the views of the government, but also with what might safely be considered as the permanent policy, as well as interest, of the States themselves. The new government could neither entirely disregard these circumstances, nor consider them as permanent.  In adopting the temporary mode of proceeding with executions then prevailing in the several States, it was proper to provide for that return to ancient usage, and just, as well as wise principles, which might be expected from those who had yielded to a supposed necessity in departing from them.  Congress, probably, conceived, that this object would be best effected by placing in the Courts of the Union the power of altering the " modes of proceeding in suits at common law," which includes the modes of proceeding in the execution of their judgments, in the confidence, that in the exercise of this power, the ancient, permanent, and approved system, would be adopted by the Courts, at least as soon as it should be restored in the several States by their respective legislatures.  Congress could not have intended to give permanence to temporary laws of which it disapproved; and, therefore, provided for their change in the very act which adopted them.

But the objection which gentlemen make to this delegation of legislative power seems to the Court to be fatal to their argument.  If Congress cannot invest the Courts with the power of altering the modes of proceeding of their own officers, in the service of executions issued on their own judgments, how will gentlemen defend a de-

legation of the same power to the State legislatures? The State assemblies do not constitute a legislative body for the Union. They possess no portion of that legislative power which the constitution vests in Congress, and cannot receive it by delegation. How, then, will gentlemen defend their construction of the 34th section of the Judiciary Act? From this section they derive the whole obligation which they ascribe to subsequent acts of the State legislatures over the modes of proceeding in the Courts of the Union. This section is unquestionably prospective, as well as retrospective. It regards future, as well as existing laws. If, then, it embraces the rules of practice, the modes of proceeding in suits; if it adopts future State laws to regulate the conduct of the officer in the performance of his official duties, it delegates to the State legislatures the power which the constitution has conferred on Congress, and which, gentlemen say, is incapable of delegation.

As construed by the Court, this section is the recognition of a principle of universal law; the principle that in every forum a contract is governed by the law with a view to which it was made.

But the question respecting the right of the Courts to alter the modes of proceeding in suits at common law, established in the Process Act, does not arise in this case. That is not the point on which the Judges at the circuit were divided, and which they have adjourned to this Court. The question really adjourned is, whether the laws of Kentucky respecting execu-

tions, passed subsequent to the Process Act, are applicable to executions which issue on judgments rendered by the Federal Courts?

If they be, their applicability must be maintained, either in virtue of the 34th section of the Judiciary Act, or in virtue of an original inherent power in the State legislatures, independent of any act of Congress, to control the modes of proceeding in suits depending in the Courts of the United States, and to regulate the conduct of their officers in the service of executions issuing out of those Courts.

That the power claimed for the State is not given by the 34th section of the Judiciary Act, has bee fully stated in the preceding part of this opinion. That it has not an independent existence in the State legislatures, is, we think, one of those political axioms, an attempt to demonstrate which, would be a waste of argument not to be excused. The proposition has not been advanced by counsel in this case, and will, probably, never be advanced. Its utter inadmissibility will at once present itself to the mind. if we imagine an act of a State legislature for the direct and sole purpose of regulating proceedings in the Courts of the Union, or of their officers in executing their judgments. No gentleman, we believe, will be so extravagant as to maintain the efficacy of such an act. It seems not much less extravagant, to maintain, that the practice of the Federal Courts, and the conduct of their officers, can be indirectly regulated by the State legislatures, by an act professing to re-

gulate the proceedings of the State Courts, and the conduct of the officers who execute the process of those Courts. It is a general rule, that what cannot be done directly from defect of power, cannot be done indirectly.

The right of Congress to delegate to the Courts the power of altering the modes (established by the Process Act) of proceedings in suits, has been already stated ; but, were it otherwise, we are well satisfied that the State legislatures do not possess that power.

This opinion renders it unnecessary to consider the other questions adjourned in this case. If the laws do not apply to the Federal Courts, no question concerning their constitutionality can arise in those Courts.

CERTIFICATE. This cause came on to be heard on the questions certified from the United States Court for the seventh circuit and District of Kentucky, and was argued by counsel : on consideration whereof, this Court is of opinion, that the statutes of Kentucky in relation to executions, which are referred to in the questions certified to this Court, on a division of opinion of the said Judges of the said Circuit Court, are not applicable to executions which issue on judgments rendered by the Courts of the United States ; which is directed to be certified to the said Circuit Court.