### STEAM STONE-CUTTER CO. v. SEARS.

*(Circuit Court, D. Vermont. October 11, 1881.)*

1. PROCEDURE—WRITS OF SEQUESTRATION IN THE NATURE OF ATTACHMENT— LIENS.

    Under its rules, this court has the power to issue writs of sequestration in the nature of attachment; and such writs, when duly served, create valid liens upon real property in this state so attached, as against a grantee with knowledge of the attachment to whom the property was conveyed *pendente lite.*

2. SAME—SERVICE.

    Due service is service in the manner provided by the state statutes.

3. *Semble* that the knowledge or ignorance of the grantee does not affect the validity of the levy.

In Equity.

*Prout & Walker,* for orator.

*E. J. Phelps* and *Wm. Batchelder,* for defendant.

WHEELER, D. J. The orator, as owner of a patent, brought a bill in this court against the Windsor Manufacturing Company for infringement, and obtained a decree establishing the title to and validity of the patent, the fact of infringement, and for an account of profits. After this decree, on application of the orator a writ of sequestration, in the nature of an attachment, to create a lien for satisfying the decree, was issued, and served by attaching the real estate of that defendant in accordance with statutes of the state of long standing, which enable the courts of chancery of the state to issue such process and create such liens. After this attachment, that defendant conveyed to this defendant, who had full knowledge of the attachment, a portion of the estate so attached. The orator obtained a final decree for the payment of money in the original cause, took out execution thereon, and caused it to be levied upon that estate, and caused the estate to be set out to the orator in satisfaction of so much of the execution as it would apply to, at its appraised value, agreeable to the statutes of the state in relation to levy of execution upon real estate. The defendant refuses to recognize the validity of the attachment and levy, and claims to hold the land against them. This bill is brought to confirm and enforce the orator's attachment and levy, and to obtain possession of the estate, and the cause has been heard upon bill and answer.

No question is made about the propriety or regularity of the writ of attachment issued in this case, if there was authority to issue such a writ at all; nor about the regularity of the attachment upon the writ, or the levy of the execution and setting out the estate by the

marshal, according to the laws of the state, if the attachment could effectually be so made, or the estate be so levied upon in any case in equity. The only questions made are as to whether the court has the power to issue such writs, and whether the service of such a writ in that manner created a lien that will hold until decree. It has been the practice of the court for about 30 years to issue such writs, upon cause shown, in this manner, some of which have been served by attaching real estate in this manner, but doubts have arisen latterly in respect to the legality of this course. In no case has the question arisen, so far as is known, except upon the application for the writ, and not then so as to involve appearance for the opposite party or argument. It is presented now for the first time for debate, and has been argued with thoroughness and ability upon each side.

An attempt has been made to rest these proceedings upon the general authority, usage, and practice of courts of chancery. That such courts have issued writs of sequestration from the earliest times is abundantly shown. Hind. 127; *Colston* v. *Gardiner*, 2 Ch. Cas. 44; *Francklyn* v. *Colhoun*, 3 Swanst. 276; *Peck* v. *Crane*, 25 Vt. 146. But these writs were always issued in the nature of distresses to compel appearance or performance of some decree or order, and not for the purpose of creating a mere lien upon property to be held for the satisfaction of a money decree. These proceedings must be maintained, if at all, by the force of the statute of the United States, the rules and practice of the courts in pursuance thereof, and the laws of the state adopted thereby; although the practice of courts of chancery, both ancient and modern, is to be looked into for the purpose of understanding and applying these statutes and rules.

The statutes of the United States make a distinction between common-law causes and equity and admiralty causes as to provision for process, and forms and modes of procedure. For the former, the practice, proceedings, and remedies by attachment and execution of the courts of the states are adopted. Rev. St. §§ 914, 915, 916. For the latter, it is merely provided that—

"The forms of mesne process, and the forms and modes of proceeding in suits of equity and of admiralty and maritime jurisdiction, in the circuit and district courts, shall be according to the principles, rules, and usages which belong to courts of equity and of admiralty respectively, except when it is otherwise provided by statute or by rules of court made in pursuance thereof; but the same shall be subject to alteration and addition by the said courts respectively, and to regulation by the supreme court, by rules prescribed from time to time to any circuit or district court, not inconsistent with the laws of the United States." Rev. St. § 913.

—And that the circuit and district courts shall have power to issue all writs necessary for the exercise of their respective jurisdictions, and agreeable to the usages and principles of law. Section 716. There are no provisions in the statutes for execution upon decrees in equity or admiralty causes, and none for liens thereby, except that it is provided that—

"Judgments and decrees rendered in a circuit or district court, within any state, shall cease to be liens on real estate or chattels real in the same manner and at like periods as judgments and decrees of the courts of such state cease, by law, to be liens thereon." Section 967.

Still, decrees in equity and in admiralty, in the circuit and district courts, become liens upon the lands of defendants therein in states where like decrees of the state courts become such liens, the same as the decrees of the state courts do. *Ward* v. *Chamberlain*, 2 Black, 430. And suits *in personam* in admiralty may be commenced by attachment of the property of the libellee, to be held to answer the demand. *Manro* v. *Almeida*, 10 Wheat. 473. These remedies rest upon the principles and usages which belong to such courts, and the rules of the courts respectively, and not upon any express provision of the statutes. And in giving construction to the statute prescribing those principles and usages as guides of procedure, reference is to be had to the practice of those courts in this country as grafted upon the English practice. This was expressly laid down as to admiralty proceedings, in *Manro* v. *Almeida*. The form of the writ of execution in equity cases, upon decrees for the payment of money, has been provided by the supreme court, in equity rule 8, and no other provision is made in those rules in regard to such executions. All the rest is left to the circuit and district courts. This court provided, by rule 11, that "the creation, continuance, and termination of liens and rights created by attachment of property, or the arrest of a defendant, shall be governed by the laws of this state." This state has, and has had almost from its organization as a state, the English equity system with its jurisdiction vested in courts of chancery, and those courts have had the power from nearly as early a period to issue writs of attachment like the one in question, having the force and effect claimed in behalf of this one. Such writs were within the principles and usages belonging to those courts. Such a writ of attachment was as well settled in the jurisprudence of the state as belonging to the courts of equity, as attachments upon mesne process were settled to belong to the courts of common law. The rules of this court are not divided into rules in equity and rules at law at

all, but are all together in one body, and left to operate on the law side or equity side of the court as they may be applicable. The laws of the state, adopted by this rule, are as applicable to equity cases as they are to common-law cases, and, not being restricted by the rule to either, must have been intended for both. This rule covers the issuing and force of this writ. The power to make such a rule in cases where the supreme court has not acted is as well conferred as the power of that court to make rules for the circuit and district courts is. The language conferring it is as explicit, and comes from the same authority. In *Beers* v. *Haughton,* 9 Pet. 329, Mr. Justice Strong said:

"State laws cannot control the exercise of the powers of the national government, or in any manner limit or affect the operation of the process or proceedings of the national courts. The whole efficacy of such laws in the courts of the United States depends upon the enactments of congress. So far as they are adopted by congress they are obligatory. Beyond this they have no controlling influence. Congress may adopt such state laws directly by a substantive enactment, or they may confide the authority to adopt them to the courts of the United States. The constitutional validity and extent of the power thus given to the courts of the United States to make alterations and additions in the process, as well as in the modes of proceeding in suits, was fully considered by this court in the cases of *Wayman* v. *Southard,* 10 Wheat. 1, and *Bank of U. S.* v. *Halstead,* 10 Wheat. 51. The result of this doctrine, as practically expounded or applied in the case of *Bank of U. S.* v. *Halstead,* is that the courts may, by their rules, not only alter the forms, but the effect and operation of the process, whether mesne or final, and the modes of proceeding under it."

In *Bank of U. S.* v. *Halstead,* it was held that the law of the United States, authorizing the courts of the United States to alter their processes, authorized them to so alter them as to make lands subject to execution which were not so subject under state laws. The objection was made there, as it had been in *Wayman* v. *Southard,* that congress could not delegate such powers to the courts, because they were legislative powers.

In *Wayman* v. *Southard,* Chief Justice Marshall said, as to this objection:

"If congress cannot invest the courts with the power of altering the modes of proceeding of their own officers, in the service of executions issued on their own judgments, how will gentlemen defend a delegation of the same power to the state legislatures? The state assemblies do not constitute a legislative body for the Union. They possess no portion of that legislative power which the constitution vests in congress, and cannot receive it by delegation."

In *Bank of U. S.* v. *Halstead*, Mr. Justice Thompson said:

"If the alterations are limited to mere form, without varying the effect and operation of the process, it would be useless. The power here given, in order to answer the object in view, cannot be restricted to form, as contradistinguished from substance, but must be understood as vesting in the courts authority so to frame, mould, and shape the process as to adapt it to the purpose intended. The general policy of all the laws on this subject is very apparent. It was intended to adopt and conform to the state process and proceedings, as the general rule, but under such guards and checks as might be necessary to insure the due exercise of the powers of the courts of the United States. It is said, however, that this is the exercise of legislative power which could not be delegated by congress to the courts of justice. But this objection cannot be sustained. There is no doubt that congress might have legislated more specifically on the subject, and declared what property should be subject to executions from the courts of the United States. But it does not follow that because congress might have done this they necessarily must do it, and cannot commit the power to the courts of justice."

These authorities well establish the validity of the rule of this court regulating attachments. It is strenuously contended in behalf of the defendant that if this writ was valid its service, which was by copy of the writ and return of attachment upon it lodged in the town clerk's office where the land records are kept, without possession, was not, and that it did not create any lien upon the land. If this was strictly a sequestration this point would be well taken; but it is not, although it is called so to some extent. A sequestration is intended to accomplish its object by the actual taking of goods and chattels, or the rents and profits of lands, and withholding them until the distress brings compliance with what is then required, and it creates no lien in favor of future judgments or decrees, while an attachment creates such a lien and nothing more. This is in effect strictly an attachment to create a lien, and is so understood in the laws of the state adopted by the rule. *French* v. *Winsor*, 36 Vt. 412. The creation of the lien provided for by the rule includes as well the mode of service as the issuing of the writ, and adopts the state law for both purposes. Besides, if the writ was valid, and there was no law or rule providing any mode of service, the return upon the process of an attachment of land would be sufficient without any taking possession or entry upon the land by the officer. *Taylor* v. *Mixter*, 11 Pick. 341. And this argument would prove too much; for, if the rules of court did not provide for the service of executions in equity cases, there would be no provision at all for that purpose, nor, in fact, for issuing executions in such cases. Executions are satisfied by levy on land only by appraisal and setting out the land to the creditor under the state

laws, which make specific provision for that purpose in this state; and if that mode was not adopted by the rules of the courts in equity, and the statutes of the United States in common-law cases, there would be no way to levy executions issuing out of the United States courts upon lands within this state. ' Still, if this land had not been con-' veyed, and the record title had stood in the execution debtor, it prob-ably would not be contended but that upon a decree for the payment of money an execution could be taken out and satisfied by levy upon the land, as was done.

It was said in argument that such a rule could no more be made here than it could where attachments upon mesne process are not known, which may be true, but the effect of it, and of all such rules, in either place is limited to the continuance of liens by decrees in the state courts, by the statute before mentioned. Rev. St. § 967. The effect of the whole is to keep the liens in proceedings in the United States courts within the same bounds as in those of the state courts, according to the policy of the laws of the United States, as stated by Mr. Justice Thompson in *Bank of United States* v. *Halstead,* as before quoted. These proceedings are according to the principles, practice, and usages of courts of equity as they obtain within the state, and as the same have been recognized by this court by grant-ing such writs for many years, some of which have been served in the same manner as this. That practice is entitled to great weight on account of the learning and character of the judges adopting it, and on account of its effect in showing the cases to which the rules were understood to apply. Chief Justice Marshall, in speaking of the legality of an arrest by the marshal in Connecticut, and commit-ment to jail without a *mittimus,* as required by the laws of the state, said: "The uniform course of that court from its first establishment, dispensing with this *mittimus,* may be considered as the alteration in this particular which the court was authorized by law to make:" *Wayman* v. *Southard,* 10 Wheat. 1. These authorities and consider-ations lead to the conclusion that this lien was valid, and that the levy transferred the title to this land to the orator. This conclusion is reached with less reluctance because the defendant knew of this attachment, and purchased at a time when, so far as appears, all supposed it to be valid, and when he could protect himself against it by any provision he might require. The doubts which afterwards arose were shared in by the court, and the issuing such writs has since been avoided where the service of them might expose the mar-shal to suit for taking property, or the refusal by him to take property

on them to prosecution for neglecting to serve them, until the question of their validity should arise, so that it could be directly argued and determined. This argument and examination has removed these doubts.

Let there be a decree establishing the validity of the attachment and levy according to the prayer of the bill, with costs.