## STEAM STONE CUTTER Co. *v.* JONES and others.

*(Circuit Court, D. Vermont. September 15, 1882.)*

1. EQUITY JURISDICTION—CLOUD ON TITLE—REMEDY AT LAW—REV. ST. § 723.

On October 7, 1870, complainants obtained an interlocutory decree against the Windsor Manufacturing Company and one Lamson, awarding them damages for infringement of a patent, and referring the cause to a master to report an account of profits, etc. On October 11, 1870, the court, on proper petition and affidavits, ordered a writ of sequestration to issue against the " goods, chattels, and estate " of the defendants, to abide and respond to the final decree in the case. On October 13, 1870, the marshal attached, as the property of the Windsor Manufacturing Company, the real estate now in controversy, lodged a true copy of the writ, with description of real estate attached, in the town clerk's office of the town where the property was located, made proper return to the court, and on October 20, 1870, delivered to the clerk of the Windsor Manufacturing Company a true and attested copy of the writ, description of real estate, return, etc., and made proper return to court of such service. On February 27, 1872, the Windsor Manufacturing Company conveyed this real estate to Jones, Samson & Co. for $23,000, and covenanted that the premises were free from incumbrances, except a $10,000 mortgage and two attachments,— the attachment here shown in favor of complainants and a subsequent attachment issued from court of chancery of the state of Vermont,—and further covenanted to warrant the title against all incumbrances save the mortgage mentioned, which grantees were to pay off. The consideration consisted of this $10,000 mortgage and a mortgage executed by grantees to secure $13,000, as in five separate credit payments. Afterwards Jones, Samson & Co. conveyed portions of the real estate to defendants George, Chase, and Ray. On April 6, 1880, the master having filed his report, a decree was entered for $23,232.75 as profits to be paid complainants by defendant the Windsor Manufacturing Company; a special execution to issue if not paid in 10 days. On June 1, 1880, execution issued. Payment was demanded by the marshal on June 3, 1880, and, payment not being made, on July 30, 1880, the execution was levied and extended on the real estate previously sequestered as the estate of the Windsor Manufacturing Company. The property was duly appraised and set out in satisfaction of the said execution and the proper return and record were duly made. The six months allowed by law for redemption having expired, complainants claim the right to enter and possess said premises, but defendants hold possession and dispute the title of complainants. Complainants file their bill in equity to set aside and annul the deeds to defendants and perfect their own title, and pray that they may be let into possession of the land, and that defendants pay damages for

their wrongful withholding of possession. *Held,* that equity will not allow a title to real estate, otherwise clear, to be clouded by a claim which cannot be enforced either at law or in equity, and consequently will interfere in behalf of the holder of the legal title to remove a cloud on the same, or an impediment or difficulty in the way of an effectual assertion of his rights in a court of law; but where in an action of ejectment possession of the land and damages for wrongful withholding of possession can be recovered under section 723 of the Revised Statutes, the suit in equity cannot extend to such relief, and the decree in this case must be confined to perfecting the title of complainants to the land in controversy.

2. PRACTICE IN CIRCUIT COURTS—RULES—PROCESS—REV. ST. §§ 913, 918.

The forms of mesne process in equity, and the forms and modes of proceeding therein, are to be according to the usages of courts of equity, except as otherwise provided by statute, or by rules of court made in pursuance of statute. But any circuit court may alter and add to such forms and modes, subject to the right of the supreme court to regulate the matter for such circuit court. The supreme court has the power to prescribe the forms of writs and process, and to regulate the whole practice in suits in equity in the circuit courts; but any circuit court may, in any manner not inconsistent with any law of the United States or any rule prescribed by the supreme court, regulate its own practice to advance justice.

3. SAME—SAME—RULE 11—WRIT OF SEQUESTRATION.

Rule 11 of this court, providing that "the creation, continuance, and termination of liens and rights created by attachment of property, or the arrest of a defendant, shall be governed by the laws of this state," is a valid rule, and as the writ of sequestration as a mesne process in an equity suit has always existed in the state of Vermont, such rule authorized the issuing of the writ in this case.

4. SAME—SAME—SERVICE OF WRIT.

As the writ of sequestration is an attachment to create a lien, rule 11, in adopting the state law as to the creation of the lien, adopts the state law as to the mode of service; and as the acts of the marshal in this case were in accordance with the requirements of the laws of Vermont, the complainants obtained a valid lien.

5. NATURE OF WRIT OF SEQUESTRATION.

The writ of sequestration in Vermont is not the writ known to the English chancery, but is a mesne security, given *pendente lite,* operating in that regard, and to that end, like a provisional injunction, or a temporary receivership, or a writ of *ne exeat,* or the filing of a *lis pendens.*

*Aldace F. Walker,* for plaintiff.

*William M. Evarts* and *E. J. Phelps,* for defendants.

BLATCHFORD, Justice. This is a suit in equity. The plaintiff, a corporation, in 1868 brought a suit in equity in this court against the defendant, the Windsor Manufacturing Company, a corporation, and one Lamson, for the infringement of letters patent. The defendants appeared and answered, issue was joined, proofs were taken by both parties, the case was heard, and on the seventh of October, 1870, an interlocutory decree was entered in favor of the plaintiff, directing a recovery of profits, and referring it to a master to take

and report an account of such profits.    Afterwards the plaintiff presented to this court a sworn petition setting forth that the damages sustained by it by such infringement were large ; that it had no security for the payment thereof ; that the defendants were about to sell and dispose of their property within reach of the process of the court; that the defendant Lamson was about to remove from this state and district with such property as he might be unable to dispose of; and that unless it could, by writ of sequestration, fix a lien thereon, such litigation would be wholly fruitless in respect to said damages or profits.    The petition prayed the court to issue a writ of sequestration in favor of the petitioner against the defendants, their goods, chattels, and estate, for such purpose.    On the eleventh of October, 1870, the court, on the petition and affidavits accompanying it, ordered that such writ issue to the value of $40,000; and on that day a writ was issued in due form to the marshal of this district commanding him "to take, attach, and sequester the goods, chattels, and estate" of the defendants to the said value, "and detain and keep the same under sequestration according law, to respond to the final decree which may be made in said cause, agreeably to law in that behalf," and to notify the defendants, "as the law requires and directs."    On the thirteenth of October, 1870, the marshal, by virtue of said writ, attached, as the property of the Windsor Manufacturing Company, "all the real estate in the town of Windsor, Vermont," and "all their right, title, and equity of redemption in said real estate;" and on the same day "lodged in the town clerk's office of said town for record a true and attested copy of the original writ, with a description of the real estate so attached, with this, my return, thereon indorsed;" and on the same day delivered to the president of the corporation a true and attested copy of said writ, and a list of the property attached, with his return thereon indorsed.    He afterwards made to this court a return on the writ to the above effect.    On the twentieth of October, 1870, the marshal delivered to the clerk of the corporation a true and attested copy of the writ, together with a list and descriptions of the real estate so attached, with his said returns thereon indorsed, and he afterwards made to this court a return on the writ to said effect.

The bill in this case sets forth the foregoing matters, and avers that the town clerk's office of the town of Windsor, being by law the office where by law a deed of such real estate was required to be recorded, thereupon and by force thereof the real estate afterwards

mentioned in the bill, being part of the real estate in said town then owned by said corporation, became duly attached, sequestered, and held, under said writ, to respond to the final decree which might be made in said cause; that thereafter said master filed his report, and a decree was entered April 6, 1880, decreeing that the said corporation pay to the plaintiff, as profits and costs of suit, $23,232.75, with interest from that date, and that if said sum should not be paid within 10 days from that date special execution should issue in favor of the plaintiff against said corporation for said sum; that said corporation having neglected to pay said sum an execution was issued June 1, 1880, to the marshal on said decree; that on the third of June, 1880, the marshal, under the execution, demanded of the secretary and treasurer of the corporation the said sum, and it having neglected to make payment thereof, and the execution being unsatisfied to the amount of $21,826.82, with interest and officer's charges, he, on the thirtieth day of July, 1880, by direction of the plaintiff, extended and levied said execution on certain pieces of land in Windsor, being the same land so sequestered and attached as the estate of said corporation in fee, all the said land being the estate of the said corporation in fee; that appraisers were appointed, who appraised the said land in parcels; that parcel No. 1, on which there was a mortgage to the Windsor Savings Bank for $10,000, on which there was due $10,351.50, was appraised, subject to said mortgage, at $11,648.50, as its just and true value in money, to satisfy in part said execution and the legal charges thereon, and said marshal set out said parcel No. 1, in part satisfaction of said execution and fees, by certain metes and bounds, which are given; that parcel No. 2 was appraised and set out in like manner at $4,000, parcel No. 3 at $1,000, and parcel No. 4, on which was a mortgage on which $20,703 was due, at $3,697, subject to said mortgage; that the amount due on said execution, with interest, costs, and charges, on July 30, 1880, was $22,468.67, leaving still due thereon $2,123.17; that said marshal made a return to said effect, on said execution, on the thirtieth day of July, 1880; that said execution was on said day, with said return, duly recorded in the land records of said town, and returned into the office of the clerk of this court and there recorded; that thereby, as against said corporation, its successors and assigns, a good title was made to said parcel No. 1 in favor of the plaintiff, its successors and assigns, forever; and that six months having elapsed since said execution was so extended, and no redemption

thereof having been made within that time, as provided by law, the plaintiff has become entitled to enter and take possession of the same.

The bill also alleges that on the twenty-seventh of February, 1872, the Windsor Manufacturing Company, by its deed of that date, for the consideration of $23,000, conveyed the said parcel No. 1 to the defendants Jones, Samson & Co., covenanting in said deed that said premises were free from incumbrance, except said mortgage of $10,000, and except two attachments,—one in favor of the Steam Stone Cutter Company, and the other in favor of Barnes and others against said Windsor Manufacturing Company,—which said attachment in favor of the Steam Stone Cutter Company was the attachment and lien created by said writ of sequestration so served, and which said other attachment was an attachment and lien existing under another writ of sequestration issued by the court of chancery in the state of Vermont and served subsequently to the service of said writ in favor of the plaintiff; that in and by said deed the said company agreed with the grantees therein named to warrant and defend said premises against all claims and incumbrances, including said attachments, except said mortgage, and said grantees were to assume and pay off said mortgage; that the consideration of said deed, being $23,000, was in part composed of said $10,000 mortgage, and the balance thereof was represented by another mortgage, executed on the same day by said Jones, Samson & Co., to said company for $13,000, represented by five notes,—four for $2,500 each, payable severally in 18, 30, 42, and 54 months from date, and one for $3,000, payable in 66 months from date,—and which conveyed the said premises in mortgage to said company as security for said notes, the same being, in said mortgage, expressed to be subject to said savings-bank mortgage and said two attachments; that said mortgage to said company still remains in force and undischarged of record, and the debt secured thereby is not paid; that subsequently said Jones, Samson & Co. conveyed portions of said premises at different times to the defendants George, Chase, and Ray, respectively; that the parcels so conveyed to George and Chase have been released by said company from the lien of its said mortgage; that much the greater part of said premises still remains unconveyed by said Jones, Samson & Co., and in their possession and occupation; that the defendants Jones, Samson & Co., George, Chase, and Ray are in possession of said real estate and refuse to permit the plaintiff to enter and take possession thereof, and deny the plaintiff's right so to do, claiming for them-

selves the right to hold and occupy the same under said conveyance; that said conveyance and mortgage constitute a cloud upon the title of the plaintiff to said real estate, and the plaintiff is entitled to the aid of this court to remove the same and to be let into the possession of the said premises; that the defendants pretend that said writ did not create a valid lien in favor of the plaintiff upon said real estate, whereas the contrary is true, and the plaintiff's title thereto under said proceedings is complete, and is paramount to any right or title of the defendants to the same, and the plaintiff is entitled in this suit to have said conveyances to said defendants annulled and set aside, and its title to said premises confirmed; that the order of this court directing said writ to issue has never been revoked, and has always been acquiesced in by said company; that said company was insolvent at and before the date of said conveyances to said defendants, and the said transfer of said premises to said Jones, Samson & Co. was made by it for the purpose of defeating the effect of said writ; and that if the plaintiff's title to said premises under said writs of sequestration and execution shall be held to be incomplete, the plaintiff is entitled to maintain this bill, on said facts, as a bill in the nature of a creditor's bill against said company and said Jones, Samson & Co., and to recover and apply in part satisfaction of said decree the amount of said mortgage debt so owing by said Jones, Samson & Co. to said company, no satisfaction of said decree having been made except as appears by said return on said execution.

The bill prays that the said conveyances may be set aside and canceled; that the plaintiff's right and title to said real estate may be established and confirmed; that the plaintiff may be let into possession of the same; that the defendants may be perpetually enjoined from interfering with the plaintiff's possession thereof, and may be decreed to pay to the plaintiff all damages occasioned by their wrongful withholding of such possession; or, in case it shall be considered by the court that the plaintiff is not entitled to said relief, then that said Jones, Samson & Co. may be required to pay the plaintiff the amount of said mortgage debt in part satisfaction of said decree.

The answer of Jones, Samson & Co. admits the various proceedings in the original suit, the issuing of the writ of sequestration, so called, its pretended service, the final decree, the issuing of the execution, the pretended levy and extension thereof on the property of the defendants described in the bill, and the return and record of said execution, all substantially as stated in the bill, and that said writ of sequestration has never been annulled or set aside by any special

order of the court in the premises; but it denies the validity or legality of said writ of sequestration, or of said pretended service thereof, or of said attempted levy or extension of said writ of execution on said property, and denies that said proceedings conveyed to the plaintiff any legal or valid title to any part of said property. It avers that said writ of sequestration was issued without warrant or authority of law, and, without any legal power in the court to issue the same; that the same was and is therefore void; that the pretended service thereof by an attempted attachment of said property in the manner stated in said bill was not a legal or sufficient service thereof, even if said writ was legal and valid; that said writ nor a copy thereof was never recorded in the town clerk's office of said town of Windsor in the records of attachments, as provided by law; that said service, as made, effected no legal attachment or sequestration of said property, and created no lien thereon; and that said levy or extension of execution was void and ineffectual as against the defendants, and created no title as against them. It admits that the defendants purchased certain real estate of said Windsor Manufacturing Company, not correctly described in said bill, and took a conveyance thereof from said company on the twenty-seventh of February, 1872, a copy of said deed being annexed to the answer; that the consideration of said deed was $23,000, made up by a prior and valid mortgage on said property to the Windsor Savings Bank to secure $10,000, which mortgage the defendants assumed to pay, and by five promissory notes of the defendants to the amount of $13,000 to said company, payable at various times and secured by mortgage on said property; that the said conveyance to the defendants was duly executed, acknowledged, and recorded in the land records of said town of Windsor at the time of the date thereof, and before said levy, and conveyed a good and valid title at law in fee to the defendants, their heirs and assigns; that the consideration thereof was the true and just value of said property; that said notes were paid by the defendants before said pretended levy; and that said purchase was made, and said conveyance taken, and said notes paid by the defendants in entire good faith and in the regular course of business, without any intent or design on their part to hinder or defraud the plaintiff or any other creditor of said company, or to withdraw or cover said property from attachment or execution, and without any knowledge or notice or belief on the part of the defendants that such was the intention, design, or desire of said company in selling or conveying said property. It admits that the

defendants are, and have been since the twenty-seventh of February, 1872, in possession of the property described in the bill, claiming title thereto, except so far as they have conveyed certain portions thereof; and that they deny the validity of the plaintiff's pretended title, and refuse to relinquish their said possession. It admits that since the defendants acquired title and possession they have conveyed certain parcels of said property to the defendants George, Chase, and Ray, respectively. It avers that said conveyances were valid, and made in good faith and upon sufficient consideration, and gave to said several grantees valid and legal titles to said respective parcels, under which they are now in possession. As to the claim of the plaintiff for an accounting and decree against the defendants in respect to said mortgage notes so executed to said company by the defendants, it avers that even if said notes had not been paid, as before stated, long before the filing of the bill, the claim of the plaintiff could not be legally maintained, and the plaintiff would not be entitled to the relief sought. It avers that at the time of said conveyance of February 27, 1872, to the defendants the said company was solvent, and able to pay its debts aside from its indebtedness to its directors.

The other defendants have put in answers to the same purport and setting up the same defenses.

The case has been heard on pleadings and proofs. Irrespective of the merits of the issues raised, the defendants contend that a plain, adequate, and complete remedy may be had at law by the plaintiff in this case, and that, therefore, this suit in equity cannot be maintained. Rev. St. § 723. It is true that in an ejectment suit at law the plaintiff could establish its title to the land, and obtain a judgment for the possession of the land, and a writ of possession, and a judgment for damages for the withholding of possession. But it could not, in such suit at law, obtain a decree setting aside and canceling the conveyances made to the defendants, and an injunction perpetually enjoining the defendants from interfering with the plaintiff's possession, when such possession shall be obtained.

The case of *Ward* v. *Chamberlain*, 2 Black, 430, is authority for holding that the plaintiff is entitled to so much of the relief it prays for as involves the determination of the rights and interests of the parties in the land in question; and, if the plaintiff's title to the land is valid as against the defendant's, to a decree establishing that title, and setting aside the conveyances made to the defendants, and to the injunction asked for.

In *Ward* v. *Chamberlain* the court say:

"Equity will not allow a title to real estate otherwise clear to be clouded by a claim which cannot be enforced either at law or in equity, and consequently will interfere in behalf of the holder of the legal title to remove a cloud on the same, or an impediment or difficulty in the way of an effectual assertion of his rights in a court of law."

In that case the plaintiffs had an execution on a decree levied on lands of two of the defendants, which they owned before the decree was rendered. The other defendants claimed interests in and liens on said lands. The bill prayed that the rights of the parties, and the dates and validity of their several liens, in respect of the lands might be ascertained, and that the lands might be sold and the proceeds applied to the payment of the amount due on the decree. The plaintiffs there might, before going into equity, have proceeded to a sale under their execution. But the jurisdiction in equity was maintained, to the extent of removing the cloud on the plaintiffs' title, though not to the extent of selling the lands under the decree in equity. The plaintiffs in that case were, as is the plaintiff in this case, out of possession.

The question as to the validity of the writ of sequestration was fully considered by Judge Wheeler in the case of *Steam Stone Cutter Co.* v. *Sears*, 9 FED. REP. 8, in this court, where the same writ was involved. In that case no question was made about the propriety or regularity of the writ issued, if there was authority to issue such a writ at all, nor about the regularity of the attachment upon the writ, or of the levy of the execution and the setting out of the estate by the marshal according to the laws of Vermont, if the attachment could be effectually so made, or the estate be so levied upon, in any case in equity. The only questions made were as to whether the court had the power to issue such writs, and whether the service of such a writ, in the manner in which it was served, created a lien that would hold until decree. The court held that Rule 11 of this court covered the issuing and force of the writ; that the rule was a valid rule; that the service of the writ in the manner in which it was served, without taking possession of the land, was a valid service and created a lien on the land; and that the plaintiff was entitled to a decree establishing the validity of the attachment and levy. The questions involved in the present case have been argued very fully and ably before the circuit justice and Judge Wheeler, and have been carefully considered. The use of the writ of sequestration as mesne process of attachment,

in a suit in equity in the court of chancery of Vermont, is coeval with the institution of that court.

In the act of the legislature of Vermont passed March 7, 1797, (Tolman, Compil. c. 7,)—Vermont having been admitted into the Union February 19, 1791,—constituting a court of chancery, it was provided (section 5) that "pending any bill in chancery before said court" the judges should "have power, on sufficient reason being shown and verified by affidavit, to issue a writ of sequestration against the goods, chattels, or estate of the defendant or defendants in said bill; and such writ of sequestration shall be served in the same manner as is directed by law in the case of attachments on mesne process; and the estate thereby sequestered shall, in like manner, be holden to respond to the decree which shall be finally made on said bill." An enactment in substantially the same words has always existed, and still exists, in the statutes of Vermont. It is apparent that this writ of sequestration is merely an attachment by mesne process in an equity suit. It is called "sequestration." It might as well have been called something else. It is not the writ of sequestration known to the English chancery.

Rule 11 of this court, which was in force when the writ in this case was issued, reads thus:

"The creation, continuance, and termination of liens and rights created by attachment of property or the arrest of a defendant shall be governed by the laws of this state."

This rule is one of a body of rules, 55 in number, adopted by this court. They were adopted at a term of the court held by Mr. Justice Nelson and Judge Smalley, sitting together, at a time when they were the only judges of this court. This fact is one of which this court takes cognizance for itself. The fact, if otherwise, may be shown to be otherwise; but it is not so shown. There can be no doubt that rule 11 applies to a lien and right created by the attachment of property under a writ of sequestration in an equity suit, such as the Vermont statute referred to provides for. Did this court have power to adopt this Vermont writ of sequestration? It was provided as follows by section 17 of the act of September 24, 1789, (1 St. at Large, 83:)

"All the said courts of the United States shall have power to make and establish all necessary rules for the orderly conducting business in the said courts, provided such rules are not repugnant to the laws of the United States."

This was followed by section 7 of the act of March 2, 1793, (Id. 335,) which provided as follows:

"It shall be lawful for the several courts of the United States from time to time, as occasion may require, to make rules and orders for their respective courts, directing the return of writs and process, the filing of declarations and other pleadings, the taking of rules, the entering and making up judgments by default and other matters in vacation, and otherwise, in a manner not repugnant to the laws of the United States, to regulate the practice of the said courts respectively, as shall be fit and necessary for the advancement of justice, and especially, to that end, to prevent delays in proceedings."

In regard to these two enactments the supreme court said, in *Wayman* v. *Southard*, 10 Wheat. 1, that they "give the court full power over all matters of practice," and that congress had authority to so enact.

Prior to the act of 1793 the following provisions in regard to process were enacted by section 2 of the act of May 8, 1792, (1 St. at Large, 276:)

"The forms of writs, executions, and other process, except their style, and the forms and modes of proceeding in suits, in those of common law, shall be the same as are now used in the said courts respectively, [supreme, circuit, and district,] in pursuance of the act entitled 'An act to regulate processes in the courts of the United States,' [act of September 29, 1789; 1 St. at Large, 93,] in those of equity and in those of admiralty and maritime urisdiction, according to the principles, rules, and usages which belong to courts of equity and to courts of admiralty respectively, as contradistinguished from courts of common law, except so far as may have been provided for by the act to establish the judicial courts of the United States, [act of September 24, 1789; 1 St. at Large, 73,] subject, however, to such alterations and additions as the said courts respectively shall, in their discretion, deem expedient, or to such regulations as the supreme court of the United States shall think proper, from time to time, by rule, to prescribe to any circuit or district court concerning the same: provided, that on judgments in any of the cases aforesaid, where different kinds of executions are issuable in succession, a *capias ad satisfaciendum* being one, the plaintiff shall have his election to take out a *capias ad satisfaciendum* in the first instance."

Under this statute it is very plain that each circuit court had the right, in respect to the forms of writs and other process, and the forms and modes of proceeding in equity suits, to make alterations and additions, except as to matters where the supreme court had, by rule, prescribed a practice to such circuit court.

In respect to this statute the supreme court said, in *Bank of U. S.* v. *Halstead*, 10 Wheat. 51·

" There can be no doubt that the power here given to the courts extends to all the subjects in the preceding parts of the section, and embraces as well the forms of process and modes of proceeding in suits of common law, as those of equity, and of admiralty and maritime jurisdiction.   *   *   *   Power is given to the courts over the subject with a view, no doubt, so to alter and mould their processes and proceedings as to conform to those of the state courts, as nearly as might be, consistently with the ends of justice.   This authority must have been given to the courts for some substantial and beneficial purpose.   If the alterations are limited to mere form, without varying the effect and operation of the process, it would be useless.   The power here given, in order to answer the object in view, cannot be restricted to form as contradistinguished from substance, but must be understood as vesting in the courts authority so to frame, mould, and shape the process as to adapt it to the purpose intended."

In that case it was held that the circuit court for Kentucky had authority to alter the form of the process of execution in a suit, so as to extend to real as well as personal property, when, by the laws of Kentucky, lands were made subject to the like process from the state courts.

The act of September 29, 1789, § 2, (1 St. at Large, 93,) referred to above, provided as follows:

" Until further provision shall be made, and except where by this act or other statutes of the United States is otherwise provided, the forms of writs and executions, except their style, and modes of process, and rates of fees except fees to judges in the circuit and district courts in suits at common law, shall be the same in each state respectively as are now used and allowed in the supreme courts of the same.   And the forms and modes of proceedings in causes of equity, and of admiralty and maritime jurisdiction, shall be according to the course of the civil law, and the rates of fees the same as are or were last allowed by the states respectively in the court exercising supreme jurisdiction in such causes. "

Afterwards the act of May 19, 1828, (4 St. at Large, 278,) was passed, section 1 of which enacted as follows:

" The forms of mesne process, except the style, and the forms and modes of proceeding in suits in the courts of the United States held in those states admitted into the Union since the twenty-ninth day of September, in the year 1789, [of which Vermont was one,] in those of common law shall be the same in each of the said states respectively as are now used in the highest court of original and general jurisdiction of the same in proceedings in equity according to the principles, rules, and usages which belong to courts of equity, and in those of admiralty and maritime jurisdiction according to the principles, rules, and usages which belong to courts of admiralty, as contradistinguished from courts of common law, except so far as may have been otherwise provided for by acts of congress; subject, however, to such alterations and additions as the said courts of the United States respectively shall, in their discre-

tion, deem expedient, or to such regulations as the supreme court of the United States shall think proper, from time to time, by rules, to prescribe to any circuit or district court concerning the same."

This act was designed to apply the provisions of the act of May 8, 1792, to states which had been admitted into the Union since September 29, 1789, and by section 1 of the act of August 1, 1842, (5 St. at Large, 499,) the provisions of the said act of May 19, 1828, were made applicable to such states as had been admitted into the Union since that date. It is worthy of remark that the act of 1828 speaks particularly of the "forms of mesne process," and omits the words "forms of writs, executions, and other process," found in the act of 1792. The decisions in regard to the act of 1792 apply to the act of 1828.

In *Beers* v. *Haughton*, 9 Pet. 329, the supreme court, construing the act of 1828, said:

"This act was made after the decisions in 10 Wheat. 1, 51, and was intended to confirm the construction given in those cases to the acts of 1789 and 1792, and to continue the like powers in the courts to alter and add to the processes, whether mesne or final, and to regulate the modes of proceedings in suits and upon processes, as had been held to exist under those acts."

By section 6 of the act of August 23, 1842, (5 St. at Large, 518,) it was enacted as follows:

"The supreme court shall have full power and authority, from time to time, to prescribe and regulate and alter the forms of writs and other processes to be used and issued in the district and circuit courts of the United States, and the forms and modes of framing and filing libels, bills, answers, and other proceedings and pleadings in suits at common law, or in admiralty, or in equity, pending in the said courts, and also the forms and modes of taking and obtaining evidence, and of obtaining discovery, and generally the forms and modes of proceeding to obtain relief, and the forms and modes of drawing up, entering, and enrolling decrees, and the forms and modes of proceeding before trustees appointed by the court, and generally to regulate the whole practice of the said courts, so as to prevent delays, and to promote brevity and succinctness in all pleadings and proceedings therein, and to abolish all unnecessary costs and expenses in any suit therein."

The issuing and service of the writ of sequestration in this case, and all the proceedings under it prior to the issuing of execution, took place prior to the enactment of the Revised Statutes of the United States. The Revised Statutes do not re-enact that part of section 17 of the act of September 24, 1789, which is above cited. In the Revised Statutes, section 913—which is compiled from section 2 of the act of September 29, 1789, and section 2 of the act of May 8, 1792, and sec-

580 FEDERAL REPORTER.

tion 1 of the act of May 19, 1828, and section 1 of the act of August 1, 1842, as statutes in force, as appears by the marginal references— is in these words: 

"Sec. 913. The forms of mesne process, and the forms and modes of proceeding in suits of equity and of admirality and maritime jurisdiction in the circuit and district courts, shall be according to the principles, rules, and usages which belong to courts of equity and of admirality, respectively, except when it is otherwise provided by statute or by rules of court made in pursuance thereof; but the same shall be subject to alteration and addition by the said courts, respectively, and to regulation by the supreme court, by rules prescribed, from time to time, to any circuit or district court, not inconsistent with the laws of the United States."

In the Revised Statutes, section 917, which is compiled from section 6 of the act of August 23, 1842, as a statute in force, as appears by the marginal reference, is in these words:

"Sec. 917. The supreme court shall have power to prescribe, from time to time, and in any manner not inconsistent with any law of the United States, the forms of writs and other processes, the modes of framing and filing proceedings and pleadings, of taking and obtaining evidence, of obtaining discovery, of proceeding to obtain relief, of drawing up, entering, and enrolling decrees, and of proceeding before trustees appointed by the court, and generally to regulate the whole practice to be used in suits in equity or admiralty by the circuit and district courts."

In the Revised Statutes, section 918, which is compiled from section 7 of the act of March 2, 1793, and section 6 of the act of August 23, 1842, as statutes in force, as appears by the marginal references, is in these words:

"Sec. 918. The several circuit and district courts may, from time to time, and in any manner not inconsistent with any law of the United States, or with any rule prescribed by the supreme court under the preceding section, make rules and orders directing the return of writs and processes, the filing of pleadings, the taking of rules, the entering and making up of judgments by default, and other matters in vacation, and otherwise regulate their own practice, as may be necessary or convenient for the advancement of justice, and the prevention of delays in proceedings."

These enactments are the embodiment of a continuing policy applicable to all the circuit and district courts. The forms of mesne process in equity, and the forms and modes of proceeding therein, are to be according to the usages of courts of equity, except as otherwise provided by statute, or by rules of court made in pursuance of statute. But any circuit court may alter and add to such forms and modes, subject to the right of the supreme court to regulate the mat-

ter for such circuit court. The supreme court has power to prescribe the forms of writs and process, and to regulate the whole practice, in suits in equity in the circuit courts, but any circuit court may, in any manner not inconsistent with any law of the United States, or with any rule prescribed by the supreme court, regulate its own practice to advance justice.

The supreme court has prescribed rules of practice for the circuit courts as courts of equity. By rule 7 the proper mesne process, in a suit in equity to require the defendant to appear and answer, is a subpœna and a writ of attachment; and if the defendant cannot be found, a writ of sequestration is made the proper process to compel obedience to any order or decree. By rule 8 an execution is made the final process to enforce a money decree; and where the decree is for the performance of a specific act, an attachment for delinquency is provided for, with a writ of sequestration against the estate of the delinquent party, if he cannot be found. These rules do not apply to the subject of a mesne attachment in an equity suit, and there is nothing inconsistent with them in having such an attachment. The prescribing of this body of rules by the supreme court does not exclude other rules by the circuit courts as to matters not actually covered by the rules prescribed by the supreme court. *Van Hook* v. *Pendleton,* 2 Blatchf. C. C. 85. Accordingly, in rule 89 in equity the supreme court provide as follows:

"The circuit courts (both judges concurring therein) [meaning the circuit justice and the district judge, when the rule was made] may make any other and further rules and regulations for the practice, proceedings, and process, mesne and final, in their respective districts, not inconsistent with the rules hereby prescribed, in their discretion, and from time to time alter and amend the same."

It cannot be properly contended that the issuing of a mesne attachment in an equity suit in the circuit court in Vermont is an oppressive exercise of power, as against the owner of real estate situated in Vermont, when a like process is issuable in a suit in equity in the state court of chancery in a like case, although no such process is known in general equity practice. It is not to be supposed that any circuit court would adopt it unless it were derived from the equity practice of the state, and there seems to be great propriety in giving such process to a plaintiff in the circuit court, as otherwise he would be at a disadvantage, as compared with another plaintiff in the state court of chancery, in a suit against the same defendant, under the same circumstances. It is reasonable to say that the power conferred by

congress and the supreme court was given to be exercised for purposes such as those in this case. The view that congress may change the rule of procedure as to courts of equity which were in force in England at the time of the adoption of the constitution, and may alter the modes and forms of enforcing rights in equity, is sanctioned by what is said in the recent case of *Ex parte Boyd*, 4 Morr. Trans. 760, and congress may authorize the courts to do in that regard what it may do itself.

It is contended that congress, by its enactments in sections 5 and 6 of the act of June 1, 1872, (17 St. at Large, 197,) reproduced in sections 914, 915, and 916 of the Revised Statutes, has expressed distinctly its will that the forms and mode of proceeding in suits at common law, and remedies by attachment therein, against the property of a defendant, in the circuit and districts courts, may be made, by rules of court, to conform to the state legislation respecting the same, from time to time, and has impliedly declared that such conformity shall not be permitted in suits in equity. The rights acquired under the writ issued in the present case were acquired in 1870, before the act of 1872 was passed. But even if acquired after, under a rule of court made after, there is nothing in the legislation of 1872 which affects or interferes with the power existing under the statutes re-enacted in sections 913, 917, and 918 of the Revised Statutes, and the six sections referred to are all found in force together. Attachments in common-law suits are provided for by section 915, but that fact in no manner warrants the conclusion that there can be no attachment against property in a suit in equity in a circuit court. The legislation of 1872 does not purport to affect equity suits, either by inclusion or exclusion.

It is strongly urged that the use of mesne process, attaching property in an equity suit in advance of adjudication, is a subversion of the well-established doctrines of equity jurisprudence. It is a mesne security, given *pendente lite*, operating in that regard and to that end, like a provisional injunction, or a temporary receivership, or a writ of *ne exeat*, or the filing of a *lis pendens*. It has always been regarded by the legislators and jurists of the enlightened state of Vermont as a proper and useful equitable remedy. If it were prescribed *eo nomine* in an act of congress, the statute would not be obnoxious to the objection that it subverted the constitutional distinction between law and equity. So the only open question is whether the writ is lawfully provided for. Our undoubting conclusion is that the writ in this case was a valid process.

It is contended for the defendants that the writ was not served in any such manner as would make it effectual against subsequent legal conveyances of the property sought to be attached. It is said that possession of the property not having been taken by the marshal, but he having attempted merely the manner of service prescribed by the statute of Vermont for serving attachments, no lien was created. The view taken in the Sears case on this subject appears to be sound. The writ is an attachment to create a lien, and rule 11, in adopting the state law as to the creation of the lien, adopts the state law as to the mode of service.

It is also urged that the service was not even such as the statute of Vermont required; that by that statute the writ must not only be lodged in the town clerk's office, but must be recorded there; that the supreme court of Vermont has held that an actual record is necessary, and that a mere leaving for record is not sufficient; that in this case the writ was left in the town clerk's office, but was not recorded until after the defendant's title accrued; and that, therefore, when the defendants took their conveyance, there was no valid existing attachment. The facts in this case, as stipulated by the parties, are as follows: A copy of the writ, and of the marshal's return thereon, was lodged by him in the office of the town clerk of the town of Windsor, at the date stated in said return, October 13, 1870, and the indorsement of the town clerk appearing on said copy, "Received October 13, 1870, and filed at 10:45 o'clock A. M. Attest, JOHN T. FREEMAN, Town Clerk," was then made, and said copy was ever after kept in said office, and now there remains. It was kept in a bundle of papers consisting of attachments filed in said office by various attaching officers. No record thereof was made in any book by said town clerk, or any of his successors, until February 9, 1881, when the same was recorded in the book of special attachments by the then town clerk. Said Freeman was town clerk of the town of Windsor for 10 or 12 years prior to 1874. During his occupancy of that office he did not record attachments filed in it in any book of records, but was accustomed to treat them as the writ in question was treated, making his indorsement of receipt and filing thereon, and placing them in said bundle of attachment papers, which were kept as part of the official papers of said town clerk's office, and remained open to inspection on inquiry being made for attachments. The successor of said Freeman procured a book in which attachments afterwards made were recorded, and at some time previous to said Freeman's incumbency of said office a book or books had been then kept, in

which record had been made of attachments lodged in said office; but the use of said last-mentioned book for said purpose was wholly discontinued at and before the time said office was assumed by said Freeman.

The statute of Vermont (formerly Gen. St. *c.* 33, § 37, and now section 874 of title 11, *c.* 49, of the Revised Laws of 1880) provides as follows:

" When real estate is attached, a true and attested copy of such attachment, with a description of the estate attached, shall be delivered by the officer serving the same to the party whose estate is so attached, or left at his dwelling-house, or last and usual place of abode, and the officer shall also leave a true and attested copy of such attachment, with a description of the estate so attached, in the office where by law a deed of such estate is required to be recorded. · [That is, the town clerk's office in organized towns,˙and the county clerk's office in other cases.] If the party whose estate is attached does not reside in the state, a copy shall be delivered to his tenant, agent, or attorney, and if no such agent, tenant, or attorney is known, then a copy of such writ, with the officer's return thereon, lodged in the office in which a deed of such estate ought, by law, to be recorded, shall be sufficient service."

A separate provision (formerly Gen. St. *c.* 33, § 38, and now section 875 of title 11, *c.* 49, of the Revised Laws of 1880) is as follows:

" When the copy of a writ of attachment, on which real estate is attached, is lodged in the office of a town or county clerk, such clerk shall enter in a book, to be kept for that purpose, the names of the parties, the date of the writ, the nature of the action, the sum demanded, and the officer's return thereon."

The case cited and relied on by the defendants as holding that an actual record is necessary to the completion of the service of the writ and to the validity of an attachment under it, is that of *Burchard* v. *Fair Haven*, 48 Vt. 327. The Vermont statute does not use the word "record," but speaks only of the entry of certain specified matters in a book. We do not understand the supreme court of Vermont to have decided that such entry or recording is necessary to the validity of the service of the attachment or to the existence of the lien, if the requirements of section 874 are followed, and if the party objecting to the validity of the lien has actual notice of the attachment, when he acquires his title, especially where the copy of the attachment with a description of the estate attached, remains on file in the proper place in the town clerk's office. In *Burchard* v. *Fair Haven* the copies left with the town clerk were lost or removed, and not recorded, and the subsequent *bona fide* grantees of the land had no notice of the attachment before the deeds to them were recorded. The only effect at-

tributed by the court to the making by the town clerk of what is called the "record," is to give notice to those who wish to obtain information whether any land has been attached; and the court cites with approval what is said in *Huntington* v. *Cobleigh*, 5 Vt. 49, that "if a creditor or person desirous of purchasing finds no such record on inquiry, he may safely attach or purchase, unless he has other notice that an attachment has been made. The "legal attachment of the land," as in *Braley* v. *French*, 28 Vt. 546, was regarded as having been made before the recording, and the question of record was regarded as a question of constructive notice, unnecessary where there was actual notice. In the present case, the writ and return were always to be found on file in the proper place in the town clerk's office. It is not shown that any inquiry or search was made in that office as to any filing or record, or any reliance had on any absence of information there, and the statement in the conveyance from the Windsor Manufacturing Company to the defendants Jones, Samson & Co. of the premises in question, under which conveyance all the defendants claim title, is that the premises are free from every incumbrance except the $10,000 mortgage to the Windsor Savings Bank, "and two attachments, one in favor of the Steam Stone Cutter Company and the other in favor of Barnes and others against said Windsor Manufacturing Company; and said Windsor Manufacturing Company hereby engage to warrant and defend the same against all lawful claims, including the above-named attachments, except said mortgage." This conveyance was sufficient notice of the writ and of the proceedings under it, taking the place of any constructive notice.

It is also urged for the defendants that the title acquired under the plaintiff's levy does not extend to the mill pond and dam embraced within the premises covered by the levy, because the Ascutney Milldam Company originally owned the mill pond and dam, and the rest of the premises, and excepted the dam and the pond, and the land under the water of the pond, in the mortgages it gave, under which the Windsor Manufacturing Company obtained the title which it had when the levy under the writ was made, and the same title which it conveyed to the defendants. It is claimed, therefore, that there was no legal title in the Windsor Manufacturing Company to the mill pond and dam at the time of the levy, and so no title to them in the plaintiff. The answer to this is that the plaintiff has all the title which the Windsor Manufacturing Company had, and it is of no consequence in this suit that a stranger owns some land which the plain-

For final decree see *post*, 869.

tiff claims to own, but the ownership of which is disclaimed by the defendants.

The plaintiff is entitled to a decree for the equitable relief asked, and above indicated, with costs. But as to obtaining possession of the premises from the defendants, and damages, there is a plain, adequate, and complete remedy at law, and hence, under section 723 of the Revised Statutes, this suit in equity cannot extend to such relief. An ejectment suit might have been brought first, and the title tried, and possession and damages obtained, without the equitable relief here asked; but the fact that the equity suit was first brought does not authorize the overriding of the plain provision of section 723, or warrant the giving in the equity suit of the purely legal relief asked for. The statute of Vermont (Rev. Laws 1880, § 1247) authorized an action of ejectment against a person in possession of land by a person claiming its seizin or possession, and by section 1251, if the judgment is for the plaintiff, he can recover his damages, and the seizin and possession of the land. The fact that the plaintiff's title accrued under a writ issued by this court is of no force to authorize this court to give in this suit the legal relief asked, because that writ has been executed, and has passed into a title, which is now the same as any other legal title, for the purpose of relief at law. The case of *Ward* v. *Chamberlain, ut supra,* is an authority for the not decreeing possession to the plaintiff in this suit.

A decree will be entered in accordance with the foregoing views.
Judge WHEELER concurs.