# Constitutionality of Congress' Disapproval of Agency Regulations by Resolutions Not Presented to the President

Section 431 of the General Education Provisions Act, 20 U.S.C. § 1232(d), which purports to authorize Congress, by concurrent resolutions that are not to be presented to the President for his approval or veto, to disapprove Department of Education regulations for education programs it administers, is unconstitutional.

Legislative veto devices deny the President his power under Article I, § 7 of the Constitution, to veto legislation, interfere with his duty under Article II, § 3, faithfully to execute the laws, and arrogate to Congress power to interpret existing law that is constitutionally reserved to the judicial branch.

The congressional disapproval provisions of the General Education Provisions Act, 20 U.S.C. § 1232(d), are severable from the substantive rulemaking authorities conferred by the Education Amendments of 1978, P.L. No. 95-561, 92 Stat. 2143.

The Attorney General must scrutinize with caution any claim that he or any executive officer may decline to defend or enforce a statute whose constitutionality is merely in doubt. At the same time, the Executive is required to enforce the Constitution and to preserve the integrity of its functions against unconstitutional encroachments.

June 5, 1980

THE SECRETARY OF EDUCATION

MY DEAR MADAM SECRETARY: I am responding to your request for my opinion regarding the constitutionality of § 431 of the General Education Provisions Act (GEPA), 20 U.S.C. § 1232(d). That provision purports to authorize Congress, by concurrent resolutions that are not to be submitted to the President for his approval or veto, to disapprove final regulations promulgated by you for education programs administered by the Department of Education. Acting under this authority, Congress has recently disapproved regulations concerning four programs of your Department.[1] For reasons set forth below, I believe that

---

[1] H. Con. Res. 318, 96th Cong., 2d Sess. (1980), disapproves regulations issued under § 451 of the GEPA, 20 U.S.C. § 1234, pertaining to the operations of the Education Appeal Board. 45 Fed. Reg. 22,634 (1980). H. Con. Res. 319, 96th Cong., 2d Sess. (1980), disapproves regulations issued under § 322 of the Elementary and Secondary Education Act of 1965 [ESEA], 20 U.S.C. § 2962, pertaining to arts education. 45 Fed. Reg. 22,742 (1980). H. Con. Res. 332, 96th Cong., 2d Sess. (1980), disapproves regulations issued under §§ 346-48 of the ESEA, 20 U.S.C. §§ 3001-03, pertaining to law-related education. 45 Fed. Reg. 27,880 (1980). S. Con. Res. 91, 96th Cong., 2d Sess. (1980), disapproves regulations issued under Title IV of the ESEA, 20 U.S.C. §§ 3081 et seq., pertaining to grants to state and local education agencies for educational resources. 45 Fed. Reg. 23,602 (1980). The statutory authority for issuance of these regulations was added to the GEPA or the ESEA by the Education Amendments of 1978, Pub. L. No. 95-561, 92 Stat. 2143.

21

§ 431 is unconstitutional and that you are entitled to implement the regulations in question in spite of Congress' disapproval.

## I.

Under 20 U.S.C. § 1232(d), your Department is required, when it promulgates any final regulation for an "applicable program," [2] to transmit that regulation to the Speaker of the House and to the President of the Senate. This section further provides:

> Such final regulation shall become effective not less than forty-five days after such transmission unless the Congress shall, by concurrent resolution, find that the final regulation is inconsistent with the Act from which it derives its authority, and disapprove such final regulation.

In short, the two Houses of Congress can, without presidential participation, prevent the Executive from executing substantive law previously enacted by the Congress with respect to education programs. Moreover, § 1232(d), on its face, purports to delegate to the two Houses of Congress the constitutional function historically reserved to the courts to ensure that the execution of the law by the Executive is consistent with the statutory bounds established in the legislative process.

In designing a federal government of limited powers, the Framers of the Constitution were careful to assign the powers of government to three separate, but coordinate branches. They vested legislative power in the Congress, the power to execute the laws passed by the Congress in the Executive, and the power finally to say what the law is in the Judiciary. In ordering these relationships, the Framers were careful, in turn, to limit each branch in the exercise of its powers. The power of Congress to legislate was not left unrestrained, but was made subject to the President's veto. Neither was the President's power to execute the law left absolute, but Congress was empowered to constrain any executive action not committed by the Constitution exclusively to the Executive by passing legislation on that subject. Should such legislation be vetoed by the President, Congress could use its ultimate authority to override the President's veto. Both of the political branches were, in turn, to be checked by the courts' power to take jurisdiction to determine the existence of legislative authority for executive actions, and to review the acts of both Congress and the Executive for constitution-

---

[2] Under the GEPA, an "applicable program" is "any program for which an administrative head of an education agency has administrative responsibility as provided by law or by delegation or authority pursuant to law." 20 U.S.C. § 1221(b) and (c)(1)(A). Two departmental regulations recently disapproved by Congress were promulgated originally by the Commissioner of Education, under the former Department of Health, Education, and Welfare. The Commissioner's functions, however, were transferred to you under the Department of Education Organization Act, § 301(a)(1), Pub. L. No. 96–88, 93 Stat. 677 (1979). All four programs involved are now administered under your authority.

ality. This, in simplest form, is our carefully balanced constitutional system.

The legislative veto mechanism in § 1232(d) upsets the careful balance devised by the Framers. Viewed as "legislative" acts, legislative vetoes authorize congressional action that has the effect of legislation but deny to the President the opportunity to exercise his veto power under Article I, § 7 of the Constitution. Viewed as interpretive or executive acts, legislative vetoes give Congress an extra-legislative role in administering substantive statutory programs that impinges on the President's constitutional duty under Article II, § 3, of the Constitution faithfully to execute the laws. Viewed as acts of quasi-judicial interpretation of existing law, legislative vetoes arrogate to the Congress power reserved in our constitutional system for the nonpolitical judicial branch. Thus, however they may be characterized, legislative vetoes are unconstitutional.

## A. The Presentation Clauses

As illustrated by the four recent exercises of legislative veto power under § 1232(d), legislative veto devices are functionally equivalent to legislation because they permit Congress, one of its Houses, or even, on occasion, one or two of its committees, to block the execution of the law by the Executive for any reason, or indeed, for no reason at all. Under § 1232(d), the two Houses of Congress could, by passing successive concurrent resolutions, bring to a halt substantive programs, the authority for which was enacted by prior Congresses with the participation of the President. Such legislative veto devices cannot stand in the face of the language and history of the Presentation Clauses, Art. I, § 7, cls. 2 and 3.

Clause 2 provides that every bill that passes the House and the Senate shall, before it becomes law, be presented to the President for his approval or disapproval.[3] If disapproved, a bill does not become law unless repassed by a two-thirds vote of each House.

At the Philadelphia Convention of 1787, the Framers considered and explicitly provided for the possibility that Congress, by passing "resolutions" rather than bills, might attempt to evade the requirement that proposed legislation be presented to the President. During the debate on Article I, § 7, James Madison observed:

---

[3] Clause 2 provides, in pertinent part:
Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approves he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law.

> If the negative of the President was confined to *bills;* it would be evaded by acts under the form and name of Resolutions, votes &c—[and he] proposed that "or resolve" should be added after *"bill"* . . . , with an exception as to votes of adjournment &c.

2 M. Farrand, *Records of the Federal Convention of 1787* 301 (rev. ed. 1937).

Madison's notes indicate that "after a short and rather confused conversation on this subject," his proposal was at first rejected. However, at the commencement of the following day's session, Mr. Randolph, "having thrown into a new form" Madison's proposal, renewed it. It passed by vote of 9–1. *Id.,* 301–35. Thus, the Constitution today provides, in addition to Clause 2 of § 7 dealing with the passage of "bills," an entirely separate clause, Article I, § 7, cl. 3, as follows:

> Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take effect, shall be approved by him, or being disapproved by him, shall be repassed by two-thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed by the Case of a Bill.

I believe it is manifest, from the wording of Clause 3 and the history of its inclusion in the Constitution as a separate clause apart from the clause dealing with "bills," that its purpose is to protect against *all* congressional attempts to evade the President's veto power.[4] The function of the Congress in our constitutional system is to enact laws, and all final congressional action of public effect, whether or not it is formally referred to as a bill, resolution, order or vote, must follow the procedures prescribed in Article I, § 7, including presentation to the President for his approval or veto.

---

[4] The President was given his veto power, in part, in order that he might resist any encroachment on the integrity of the executive branch. *See The Federalist,* No. 48. His participation in the approval of legislation is also crucial because of his unique constitutional status as representative of all the people. As Chief Justice Taft stated in 1926:

> The President is a representative of the people just as the members of the Senate and of the House are, and it may be, at some times, on some subjects, that the President elected by all the people is rather more representative of them all than the members of either body of the Legislature. . . .

*Myers* v. *United States,* 272 U.S. 52, 123 (1926).

## B. The Separation of Powers

### 1. Executing the law

The principle of separation of powers underlying the structure of our constitutional form of government generally provides for the separation of powers among the legislative, executive, and judicial branches, and provides for "checks and balances" to maintain the integrity of each of the three branches' functions. Generally speaking, the separation of powers provides that each of the three branches must restrict itself to its allocated sphere of activity: legislating, executing the law, or interpreting the law with finality. This is not to say that every governmental function is inherently and of its very nature either legislative, executive, or judicial. Some activity might be performed by any of the three branches—and in that situation it is up to Congress to allocate the responsibility. *See, e.g., Wayman* v. *Southard,* 10 Wheat. 1, 42–43, 46 (1825) (Chief Justice Marshall). Once Congress, by passing a law, has performed that function of allocating responsibility, however, the separation of powers requires that Congress cannot control the discharge of those functions assigned to the Executive or the Judiciary, except through the plenary legislative process of amendment and repeal.

The underlying reason, well stated by James Madison, is that otherwise the concentration of executive and legislative power in the hands of one branch might "justly be pronounced the very definition of tyranny." *The Federalist,* No. 47, at 324 (Cooke ed. 1961). The shifting of executive power to the legislative branch which would be occasioned by these legislative veto devices is, I believe, undeniable; the concentration of this blended power is precisely what the Framers feared and what they set about to prevent.

The Constitution's overall allocations of power may not be altered under the guise of an assertion by the Congress of its power to pass laws that are "necessary and proper for carrying into Execution . . . Powers vested by [the] Constitution in the Government of the United States, or in any Department or Officer thereof," Art. I, § 8, cl. 18.[5] As the Supreme Court made clear in *Buckley* v. *Valeo,* 424 U.S. 1 (1976), the exercise of power by Congress pursuant to the Necessary and Proper Clause is limited both by other express provisions of the Constitution and by the principles of separation of powers.

In *Buckley,* it was argued that officers of the Congress could, under the Necessary and Proper Clause, appoint commissioners of the Federal

---

[5] It is fundamental to our concept of limited federal government that power exercised by the legislative, executive and judicial branches be traced to a provision of the Constitution or to a statute which is expressly or impliedly authorized by a provision of the Constitution. Thus, a source of authority for Congress to exercise power under legislative veto devices must be found in the Constitution in order for that authority to be recognized as legitimate. As we demonstrate below, the Necessary and Proper Clause does not grant such authority; nor does any other provision of the Constitution.

Election Commission, notwithstanding the fact that Article II, § 2, clause 2 of the Constitution placed the appointment power in the President. With regard to the relationship between the exercise of power under the Necessary and Proper Clause and other provisions of the Constitution, the Court stated the rule as follows:

> Congress could not, merely because it concluded that such a measure was "necessary and proper" to the discharge of its substantive legislative authority, pass a bill of attainder or *ex post facto* law contrary to the prohibitions contained in section 9 of Art. I. No more may it vest in itself, or in its officers, the authority to appoint officers of the United States when the Appointments Clause by clear implication prohibits it from doing so.

424 U.S. at 135.

The Constitution establishes the President's veto power as clearly as it establishes the appointment power or prohibits bills of attainder and *ex post facto* laws. Under *Buckley,* the only reasonable implication of the Framers' inclusion of Article I, § 7, clause 3 in the Constitution is that the Necessary and Proper Clause is not a source of power for evasion of these specific limitations through the enactment of legislative veto devices. I would add that, in reaching its holding in *Buckley,* the Court considered and relied upon earlier cases that seem most relevant to the constitutionality of legislative veto devices. In quoting from *Myers* v. *United States,* 272 U.S. 52 (1926), the Court recognized the relationship between the grant of executive power to the President and the issue before it. 424 U.S. at 135–136.[6] I believe that *Buckley* and the cases relied on by the *Buckley* Court foreclose arguments that the Necessary and Proper Clause grants Congress the power to provide for legislative veto devices.

Because to characterize the power exercised by the two Houses under § 1232(d) as "legislation" would necessarily require Congress to respect the President's veto power by presenting its resolutions for his approval, it is necessary for proponents of such power to deny that the power is "legislation" in the constitutional sense. They argue instead that the device is a means for Congress to oversee the execution of the

---

[6] The Court went on, in holding the appointment of Federal Election Commission members by officers of Congress to be unconstitutional, to quote the following language from its earlier decision in *Springer* v. *Philippine Islands,* 227 U.S. 189, 202 (1928):

> Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions. It is unnecessary to enlarge further upon the general subject, since it has so recently received the full consideration of this court. *Myers* v. *United States,* . . . .
> Not having the power of appointment, unless expressly granted or incidental to its powers, the legislature cannot engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection, though the case might be different if the additional duties were devolved upon an appointee of the Executive.

law by the Executive, in aid of undoubted constitutional powers to pass legislation and appropriations. Such an argument, however, cannot withstand scrutiny. Without a legislative veto, the regulations of your Department, unless invalidated by a court, would have the force of law. In depriving them of that force, the necessary effect of a legislative veto is to block further execution of a statutory program until the Executive promulgates further regulations in compliance with the current views of a Congress that may well be different from the Congress that enacted the substantive law.[7] The difference between this kind of congressional "oversight" and the legitimate oversight powers of Congress in their effect on the constitutional allocation of powers could not be more profound. By its nature, for example, the exercise of a legislative veto would be beyond judicial review because the exercise of such powers could be held to no enforceable standards. In exercising its veto, I believe it clear that Congress is dictating its interpretation of the permissible bounds for execution of an existing law; a result that can be accomplished only by legislation.

The foregoing discussion demonstrates the flaw in the argument, occasionally made, that the doctrine of separation of powers protects the executive branch only in areas that are inherently executive, and that Congress may reserve to itself control over activities entrusted to the Executive which are not "truly" executive in nature. This reasoning overlooks the basic truth that there are few activities that are clearly executive, legislative, or judicial. The first two categories, in particular, overlap to an enormous extent. Much, if not indeed most, executive action can be the subject of legislative prescription. To contend, therefore, that Congress can control the Executive whenever the Executive is performing a function that Congress might have undertaken itself is to reduce the doctrine of separation of powers to a mere shadow.

The test is not whether an activity is inherently legislative or executive but whether the activity has been committed to the Executive by the Constitution and applicable statutes. In other words, the Constitution provides for a broad sweep of possible congressional action; but once a function has been delegated to the executive branch, it must be performed there, and cannot be subjected to continuing congressional control except through the constitutional process of enacting new legislation.

## 2. Interpreting the law

Section 1232(d) authorizes disapproval of a regulation by concurrent resolution if Congress "find[s] that the final regulation is inconsistent

---

[7] In such a situation, the Executive, as a practical matter, may be giving up a measure of authority granted by the statute being administered which the courts in an appropriate case would have found to have been delegated to the Executive, if Congress had not intervened. Such a diminution of authority must, in my view, be viewed analytically as a repeal of the substantive statute to that extent.

with the Act from which it derives its authority . . . ." That section, on its face, purports to vest in the two Houses of Congress an extra-legislative power to perform the function reserved by the Constitution to the courts of determining whether a particular executive act is within the limits of authority established by an existing statute.[8] It is clear that the President constitutionally can be overruled in his interpretation of the law, by the courts and by the Congress. But the Congress can do so only by passing new legislation, and passing it over the President's veto if necessary. That is the constitutional system.

Proponents of the legislative veto, however, argue that such devices actually fortify the separation of powers by providing Congress with a check on an agency's exercise of delegated power. No doubt congressional review provides a check on agency action, just as committee review or committee chairman review would provide a check. But such review involves the imposition on the Executive of a particular interpretation of the law—the interpretation of the Congress, or one House, or one committee, or one chairman—without the check of the legislative process which includes the President's veto. In that case Congress is either usurping the power of the President to execute the law, or of the courts to construe it; or Congress is legislating. If it is legislating, the Constitution is explicit that the President must have the opportunity to participate in that process by vetoing the legislation.

## II.

Because it is my opinion that § 1232(d) is unconstitutional, it is necessary for me to consider whether that provision is severable from the underlying grants of statutory authority upon which the regulations promulgated by you were based. Section 1232(d) was enacted in 1974. When the various authorities for the four regulations disapproved by Congress were enacted in the Education Amendments of 1978, Congress gave no indication that the substantive rulemaking powers delegated to you were to be extinguished if the legislative veto device in § 431 were to be found unconstitutional. Thus, I conclude that § 431 is severable from this basic grant of substantive power. *See, e.g., Champlin*

---

[8] The role of the Judiciary in requiring conformance by the two political branches to constitutional standards and in confining the Executive to execution of the law within the bounds established by statute is too familiar to require elaboration. It is therefore not surprising that the Supreme Court has consistently taken the position that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," thus denying any Congress any binding role in the interpretation of an earlier Congress' acts. *United States* v. *Philadelphia National Bank,* 374 U.S. 321, 348–49 (1963), quoting *United States* v. *Price,* 361 U.S. 304, 313 (1960). The Court, in taking this position, has recognized both the political nature of the legislative process and differences between the functional competencies of the courts and Congress. *See United States* v. *United Mine Workers of America,* 330 U.S. 258, 282 (1947). I note that in these three cases in which the Court cautioned against permitting the views of a subsequent Congress to influence interpreting the intent of an earlier Congress in passing a particular statute, the Court was faced with situations in which the subsequent expression of Congress' view came in the context of the passage of legislation. Thus, in those cases, even any marginal relevance of the subsequent congressional expression would have been subject to the President's veto under Article I, § 7.

*Refining Co.* v. *Corporation Commission of Oklahoma,* 286 U.S. 210, 234 (1932), quoted with approval in *Buckley* v. *Valeo, supra,* 424 U.S. at 108.

### III.

Within their respective spheres of action the three branches of government can and do exercise judgment with respect to constitutional questions, and the judicial branch is ordinarily in a position to protect both the government and the citizenry from unconstitutional action, legislative or executive; but only the executive branch can execute the statutes of the United States. For that reason alone, the Attorney General must scrutinize with caution any claim that he or any other executive officer may decline to defend or enforce a statute whose constitutionality is merely in doubt. Any claim by the Executive to a power of nullification, even a qualified power, can jeopardize the equilibrium established by our constitutional system.

At the same time, the Executive's duty faithfully to execute the law embraces a duty to enforce the fundamental law set forth in the Constitution as well as a duty to enforce the law founded in the Acts of Congress, and cases arise in which the duty to the one precludes the duty to the other. In rendering this opinion on the constitutionality of § 431, I have determined that the present case is such a case.

Section 431 intrudes upon the constitutional prerogatives of the Executive. To regard these concurrent resolutions as legally binding would impair the Executive's constitutional role and might well foreclose effective judicial challenge to their constitutionality.[9] More important, I believe that your recognition of these concurrent resolutions as legally binding would constitute an abdication of the responsibility of the executive branch, as an equal and coordinate branch of government with the legislative branch, to preserve the integrity of its functions against constitutional encroachment. I, therefore, conclude that you are authorized to implement these regulations.

Sincerely.

BENJAMIN R. CIVILETTI

---

[9] The history of so-called "legislative veto" devices, of which § 431 of the GEPA is one, illustrates the difficulty in achieving judicial resolution of such an issue. Although Congress enacted the first such mechanism in 1932, only a few reported cases have potentially involved the constitutional question inherent in the legislative veto, and a court has reached the issue only once. In *Atkins* v. *United States,* 556 F.2d 1028 (Ct. Cl. 1977), *cert. denied,* 434 U.S. 1009 (1978), the Court of Claims held, four-to-three, that the provision of the Federal Salary Act of 1967, 2 U.S.C. § 359(1)(B), which permits one house of Congress to disapprove the President's proposed pay schedule under the Act, is not unconstitutional, and that the Senate's veto of a proposed judicial salary increase was therefore lawful. This Department, representing the United States, argued that the veto was unconstitutional, but that, because the veto authority was not severable from the remainder of the Salary Act, the plaintiffs had no right to additional pay. The latter view was sustained in *McCorkle* v. *United States,* 559 F.2d 1258 (4th Cir. 1977), *cert. denied,* 434 U.S. 1011 (1978).

Other cases in which the validity of a legislative veto device has been argued include *Chadha* v. *Immigration and Naturalization Service,* No. 77-1702 (9th Cir., argued April 10, 1978); and *Clark* v. *Valeo,* 599 F.2d 642 (D.C. Cir.) *aff'd,* 431 U.S. 950 (1977) (issue not ripe for determination).